**DEERING, MILLIKEN & CO., Inc.,**
Plaintiff,

v.

**TEMP–RESISTO CORPORATION and**
**Samuel Kaplan & Sons, Inc.,**
Defendants,

and

Acker & Jablow, Inc., Charles W. Carvin Co., Inc., and N. Erlanger Blumgart & Co., Inc., Additional Defendants on Counterclaims.

United States District Court
S. D. New York.
Jan. 22, 1958.

**465**

ages with reference to two patents. The first action relates to plaintiff's Patent No. 2,630,620 for a coated fabric. The second relates to Patent No. 2,630,573 for a heat retaining garment. The defendants' amended answer asserted counterclaims against the plaintiff and against the additional defendants, Acker & Jablow, Inc., Charles W. Carvin Co., Inc., and N. Erlanger Blumgart & Co., Inc.

### Previous Proceedings

Nine days after the first of the foregoing actions was brought, Temp-Resisto and Kaplan brought an action in the Supreme Court of the State of New York against Deering, Milliken & Co. and the additional defendants for unfair competition. This action was removed to this Court on April 9, 1953. In the meantime, Kaplan and Temp-Resisto had filed a counterclaim in the actions pending in this Court asking for declaratory judgment on the patent issues.

On June 22, 1953, pursuant to stipulation of the parties, this Court ordered consolidation of the two patent actions and discontinuance of the action transferred from the State Court, and provided that the allegations and prayer for relief in that action, amended so as to include anti-trust allegations and claims for relief against the additional defendants, be included as counterclaims in the consolidated patent action. Each party thereupon filed consolidated amended pleadings in this case.

On September 28, 1953, by an order of Judge Noonan of this Court, the case was referred to William H. Davis as Special Master, "to take and hear the evidence offered by the respective parties upon all the issues presented herein except damages, and to report the same with his findings of fact and conclusions of law in accordance with Rule 53 of the Federal Rules of Civil Procedure [28 U.S.C.A.], and to recommend the judgment to be entered thereon." The Court reserved full power to review, amend, or set aside the Special Master's findings of fact or conclusions of law which were to be advisory only and not in any degree

---

Townley, Updike, Carter & Rodgers, for plaintiff. Stuart N. Updike, Andrew Hughes, New York City, Charles M. Thomas, Sidney W. Russell, Washington, D. C., of counsel.

Hays, Podell, Algase, Crum & Feuer, Morgan, Finnegan, Durham & Pine, New York City, for defendant. Mortimer Hays, Mortimer Feuer, Martin Mensch, Simon H. Rifkind, Granville M. Pine, George B. Finnegan, Jr., Edward N. Costikyan, New York City, of counsel.

Hays, Sklar & Herzberg, New York City, for Additional defendants Charles W. Carvin Co., Inc. and N. Erlanger Blumgart & Co., Inc. Ben Herzberg, and Joseph S. Hellman, New York City, of counsel.

Frederick E. M. Ballon, New York City, for Additional defendant Acker & Jablow, Inc. Albert Lyons, New York City, of counsel.

DAWSON, District Judge.

These are two actions brought in March 1953 by the plaintiff, Deering, Milliken & Co., Inc., against the defendants, Temp-Resisto Corporation and Samuel Kaplan & Sons, Inc., praying for an injunction and an award of dam-

or to any extent binding upon the independent judgment of the Court and may be set aside by the Court even though not clearly erroneous, except that the Special Master's findings with respect to credibility and conflicting testimony shall be accorded the weight usually given to findings by one who has observed the witnesses."

The Special Master thereupon conducted long hearings covering a period of almost five months, at which over 6700 pages of testimony were taken, more than 350 exhibits were introduced, and various inter partes tests were conducted in his presence. On March 5, 1956, the Special Master filed his report, consisting of 119 printed pages with additional appendices.

The Special Master's report found:

(1) All of the claims of both patents in suit are valid and all of the claims of the patents, except claims 4, 5 and 6 of Patent No. 2,630,620, have been infringed by the defendants.

(2) Defendants-counterclaimants have not proved any contract, combination, or conspiracy among plaintiff and the additional defendants, or either or any of them, in violation of Tit. 15 U.S. C.A. § 1, or any monopolization or attempt to monopolize or combination or conspiracy to monopolize by or among plaintiff or the additional defendants, or any of them, in violation of Tit. 15 U.S. C.A. § 2, or any cause of action against plaintiff or the additional defendants, or either or any of them, under Tit. 15 U.S. C.A. § 15; or under Tit. 28 U.S.C.A. § 1338.

The Special Master recommended that the judgment to be entered should be as follows:

1. A decree for plaintiff on patent validity and infringement as prayed in the original complaint; and on the first counterclaim for declaratory judgment; with an order for the issuance of an injunction and such provisions as to damages as the Court may deem appropriate.

2. A decree dismissing the second and third counterclaims.

3. An order directing the payment of taxable costs to plaintiff and to the additional defendants.

Judge Noonan, who had appointed the Special Master, withdrew from the case, for reasons not connected with the action, after the report was filed, and the action was referred to me to decide the motion made by defendants to set aside the Special Master's findings of fact and conclusions of law, to rule upon the objections and exceptions to the report filed by the defendants, and to determine the issues reserved to the Court.

Hearings were held by me lasting for a number of days. Briefs and reply briefs have been received and considered.

## The Issues

There are essentially four issues in the action. They are:

1. Are the patents which were issued to the plaintiff valid?

2. If the patents are valid, have they been infringed by the defendants?

3. If the patents are valid and have been infringed by the defendants, are the actions of the plaintiff, such as alleged in the answer such as to prevent the enforcement by the plaintiff of its rights under the patents?

4. Have defendants established an independent cause of action against the plaintiff and the additional defendants for violation of the anti-trust laws or for unfair competition, as alleged in the second and third counterclaims in defendants' answer?

The Special Master found in favor of the plaintiff on each issue. Each of his conclusions is contested by the defendants, and it is therefore necessary to consider each of the issues in the light of the holding of the Special Master and to determine whether the evidence and law sustained his conclusions.

## I. Are the Patents Valid

1. *The nature of the patents*

There is no dispute that title to the patents is in the plaintiff. Each patent is a product patent.

In Patent No. 2,630,620, the patentee's objective was a heat retaining fabric bearing a thin superficial application of heat reflective metallic material to serve as an efficient reflector of heat for use under conditions where heat retention of a fabric or reflection of heat back to the wearer is desired, which fabric will retain substantially all the porosity, pliability, springiness, flexibility, cleaning and creasing characteristics of the original uncoated fabric. There are eight claims in the patent, all of which were found to be valid by the Special Master.

The patent relates to fabrics which are made heat reflective but still remain pliable, porous, and permeable to moisture, such heat reflectivity being the result of a discontinuous film of heat reflective metallic flakes being applied to one side of the fabric with a binder to adhere the flakes to the threads. Claim No. 1 provides that the film of metallic flakes should be adhered to the outermost fibers of the individual threads of the fabric "without substantial penetration into the body of said threads, whereby a multitude of air pockets is formed between said film of metallic flakes and said threads, said air pockets being substantially free of said metallic flakes, the warp and weft threads at the intersections thereof providing interstices in the fabric, said interstices and the surfaces of the fibrous warp and weft threads at said points of intersection being substantially free from said metallic flakes." Claim No. 1 for the product further provides for: "the outer exposed surfaces of the threads on said fabric on the coated side being substantially completely covered by the discontinuous heat reflective metallic film, the metallic film enveloping the upper exposed surfaces of each warp and weft thread but being discontinuous adjacent the areas of intersection of the warp and weft threads, whereby the fabric is porous, pliable and reflective to radiated heat."

An excellent analysis of the specifications and claims of Patent No. 2,630,620 is found on pages 6–20 of the Special Master's Report.

Essentially, the inventor asserted that while there had been previous attempts to impregnate fabric with metallic compositions to obtain heat reflective characteristics which the metal pigment would give the fabric, these had not met with success because they materially altered the "hand" of the fabric and destroyed its porosity by impregnation of the fabric, thereby destroying its drycleanability, limiting its pliability, and preventing the "breathing" of the fabric which, for example, would allow the passage of water vapor such as perspiration. Thus, the essential feature of the patented product is that the metallic flakes (which are to be microscopic in size) are adhered to the outer exposed surface of the threads of the fabric so that the metallic film envelopes the upper exposed surfaces of each warp and weft thread but leaves the threads at the point of intersection substantially free of metallic flakes, thus preserving porosity and pliability but making the fabric reflective to radiated heat.

The Special Master found as a fact that the invention was a "substantial innovation" (M.R. p. 44). He held that there had previously been a "recognized want of a product having the qualities of the patented product coupled with unsuccessful attempts to produce it" (M.R. p. 45).

Patent No. 2,630,573 relates to coats having selected portions, as the inner fabric liner, laminated with heat reflective coating made up of a large number of foliated metal flakes to form a reflective surface within the garment. It is a product patent covering a garment. The patent has seven claims. The method of preparing the appropriate coating compositions to be applied to the coat material and the liner is stated in the specifications to be the method set forth in previous applications for a patent for a "coated fabric." It was not disputed that if the first patent was valid

and infringed, the second patent also was valid and infringed.

## 2. *The development of the patent and its application in commercial processes*

The inventor, H. J. Rand, began working on the problem of a heat reflective lining in 1948. In 1949 Deering, Milliken became interested in the development of a metal insulated lining and on June 27, 1949 entered into an agreement with Rand. Rand thereafter, working with funds from Deering, Milliken, continued his research through 1949 and into 1950. By the end of 1949, production arrangements were completed. The new lining fabric was announced to the trade by Deering, Milliken on March 3, 1950, with the promise that the new product would reach the consumer market in the following Autumn. The new fabric was well received and by the end of 1951 it had become an established article of commerce. The yardage in 1950 was about 304,000 yards, but by 1953 it had increased to about 11,250,000 yards.

The application on which Patent No. 2,630,620 was issued was filed September 29, 1952, as a continuation of Rand's earlier application which had been filed August 28, 1950. The patent was issued March 10, 1953.

The application on which Patent No. 2,630,573 was issued was filed November 4, 1950. The patent was issued March 10, 1953.

In the period from January 1952 to March 10, 1953, the date of issuance of the patents, many competing firms, of which Kaplan was the first and foremost, came into the market with competing linings. Upon the issuance of the patents, some of the competitors took licenses from Deering, Milliken and others went out of business. Kaplan continued, however. The product of Deering, Milliken was sold under the trade-mark "Milium." The product of the defendants was sold under the name "Temp-Resisto."

The defense has alleged numerous grounds on which it asserts that the patents in suit were invalid. Only certain of these grounds were seriously pressed before the Special Master and this Court. These will be considered in order.

## 3. *Was the patent anticipated by the prior art?*

### (a) *Kirkpatrick publications*

Dr. Clifford Kirkpatrick, a sociologist, in 1943 published in mimeograph form a report entitled "Warmth Without Weight —a Venture Across Scientific Boundaries," which was put out by "Textile Research," a publication of Textile Research, Inc. and the Textile Foundation. The report was thereafter digested and included in the May 1943 issue of "Textile Research." The publications dealt with suggestions for the application of heat reflecting coatings to textiles for the purpose of insulating against the inflow of cold or the escape of heat. The publications indicated that Dr. Kirkpatrick, having noticed that an increase in warmth resulted when various articles of clothing were sprayed with aluminum paint, undertook further investigation. He suggested various methods, such as incorporating reflective materials, including aluminum powder, in the material of which the fabric is made, inserting aluminum foil between layers of fabric, chemical or electrical precipitation of metallic particles in the fabric, etc. He stated:

> "The method which from my present experiments may prove most promising consists of spraying a light and porous fabric on both sides with a suspension of a powdered metal such as aluminum in a solution of a flexible durable plastic substance such as cellulose acetate or new synthetic resins. Further treatment by heat and pressure may be applied. The fabric is then sewed or cemented between two layers of fabric."

Dr. Kirkpatrick admittedly never made fabrics of this nature. He did spray some cotton sheeting and also sprayed a cot and a tent. He never subjected any of these articles to an actual

test to determine the porosity of the fabric. The tent and cot were both coarse, harsh, thick fabrics. There was testimony that the interstices in the material were plugged with aluminum paint.

Dr. Kirkpatrick admittedly was merely offering a suggestion in the article which he wrote and not claiming that his suggestion had been reduced to actual practice. His report concludes with the statement:

"It is realized that the experiments here reported were exceedingly crude and this confession of intellectual trespass omits many details since this article is intended to be suggestive rather than conclusive. Specialists may question both the validity of the evidence and the originality of the proposals here suggested. A trespasser can however, humbly claim that blind spots may result from scientific specialization, point out a human need unsatisfied, and propose further investigation of the conservation of body heat by a heat reflecting film."

Dr. Kirkpatrick was interviewed by a newspaper reporter and the newspaper article was received in evidence. The article indicates that Dr. Kirkpatrick felt his results showed that a thin, light and yet warm textile could be created which would be practical if it could also be made durable and flexible. Dr. Kirkpatrick stated that the making of such a textile was up to the textile people, and that they were working on it. He hoped they could make something of his findings.

In 1949 Dr. Kirkpatrick had some correspondence with a Mr. Nichols, who was working with the patentee Rand. Nichols asked for certain data, such as what kind of aluminum paint was used and how much. Dr. Kirpatrick said that he had thrown away his original data and added:

"As I think back on this adventure out of my own field of Sociology the best prospect for practical application lies in a woven fabric of Al. strip sandwiched between layers of cloth etc. in sport jackets and the like."

This reply indicates that he at least thought that his prior crude experiments had not produced a practical successful lining.

The Special Master found that Kirkpatrick "expressly recognized that he had not succeeded in producing a lining fabric which had the qualities he clearly visualized; that is, which would be light, compact, porous, washable, durable, cheap and flexible—properties which are all possessed by the fabric of Rand's patent '620." (M.R. p. 43).

The United States Supreme Court has pointed out that there are many instances where a patent has been sustained in favor of the last of a series of manufacturers, all of whom were groping to obtain a certain result which only the last of them seemed to grasp. It pointed out: "In the law of patents it is the last step that wins." Washburn & Moen Mfg. Co. v. Beat 'em All Barbed Wire., 1892, 143 U.S. 275, 283, 12 S.Ct. 443, 446, 36 L.Ed. 154. This was merely the application of the rule which was earlier laid down in Coffin v. Ogden, 1874, 18 Wall. 120, 85 U.S. 821, 21 L.Ed. 821, where the Court said:

"The invention or discovery relied upon as a defense, must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant * * *. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed; while in the other case there was only progress, however near that progress may have approximated to the end in view. The law requires, not conjecture but certainty * * *. Until his work is done, the inventor

has given nothing to the public." (At page 823 of 85 U.S.)

This standard is still the rule of law. See Application of Schlittler, Cust. & Pat.App., 1956, 234 F.2d 882; Radio Corp. of America v. International Standard Elec. Corp., 3 Cir., 1956, 232 F.2d 726; Sbicca-Del Mac, Inc., v. Milius Shoe Co., 8 Cir., 1944, 145 F.2d 389; Montgomery Ward & Co. v. Clair, 8 Cir., 1941, 123 F.2d 878.

The evidence was clear that Dr. Kirkpatrick's work rested in speculation and experiment, and that he had failed to pursue his process to a point of consummation or to produce a product of the nature described in the Rand patent.

(b) *Canadian Research Report*

This was a report dated April 2, 1943 to the Canadian "Associate Committee on Aviation Medical Research" on a project for "Insulation by Reflection and the Development of a Reflecting Cloth."

This report showed that research was going on in the very field which later eventuated into the Rand patent, but that the invention of Rand had not up to that time been anticipated. The report showed the product described by Rand had not been developed for in its statement of results the report stated that the surface of the cloth must be "completely covered" and "very large metal particles must be used." Rand's invention takes a different position, for under his patent the metallic film must be "discontinuous" and the metallic particles used must be "metal flakes in finely divided form, preferably 300 mesh or finer."

The Canadian report stated in its conclusion that: "The application of insulation by reflection to protective clothing depends on the development of a satisfactory flexible reflecting cloth, and upon considerations of the disadvantages of extra weight and impermeability to water vapor." While the Canadian report may have shown the problems and have given certain suggestions for meeting them, it did not anticipate the product described in the Rand patent. Nor was there any indication that a product such as that developed by Rand was ever developed by persons working on the Canadian report.

(c) *The Cavanaugh Patent No. 1,510,-654*

■ This patent, issued on October 17, 1924, was a process patent for "Ornamenting and Proofing Fabrics." This patent was considered by the Patent Office in the prosecution of the Rand patent and was determined by the Patent Office not to be an anticipation. Having been so considered before the Rand patent was issued, the usual presumption of validity which accompanies the grant is clearly reinforced. Ensign Carburetor Co. v. Zenith-Detroit Corp., 2 Cir., 1929, 36 F.2d 684; Paragon-Revolute Corp. v. C. F. Pease Co., 7 Cir., 1957, 239 F.2d 746.

The action of the Patent Office is readily understood when we examine the Cavanaugh patent. The patent is for a process to produce an ornamental or decorative fabric, not one to produce a heat reflective fabric. The patent teaches the use of a "bronze powder" as distinguished from the foliated metallic fabrics taught by Rand. Cavanaugh teaches that the cloth is to be first subjected to "dampening or moistening treatment" (which is not the process taught by Rand) and that the fabric is to be covered all over with a bronze containing paste so that it is "intimately and permanently incorporated into the fabric itself" (which again is not taught by Rand).

The Cavanaugh patent states:

"The present process merely ornaments or modifies the color of the original fabric but does not impose upon it a distinct or separable layer or coating, and the coloring or proofing matter is intimately and permanently incorporated into the fabric itself." [1]

1. Defendants' brief on the patent issues states at p. 29: "The Cavanaugh patent is replete with the teaching that he applies a light, superficial coating so as

Defendant claims, however, that the Cavanaugh *product* itself is essentially the same product as that produced by Rand. The best evidence as to whether that was true would be a comparison of the fabrics. The Special Master examined under a microscope samples of the Cavanaugh fabric (as produced from the Patent Office) and samples of the Temp-Resisto fabric and the Milium fabric and found as a fact that the Cavanaugh sample did not resemble the other samples (R. 2199–2200). In his report he referred to this examination under the microscope and concluded as a fact that "the 'bronze powder' of the coating was very different from the metal flakes of the Rand patent and of the coatings used by plaintiff and defendant in the products 'Milium' and 'Temp-Resisto'" (M.R. p. 37). The Special Master conducted his examination in the presence of the attorneys and experts for each side. He is a graduate of a scientific school with vast experience in the field of patents and patent law. I believe that his finding of fact on the dissimilarity of the product is entitled to great weight. None of the evidence produced at the hearing before me, including the examination by me of enlarged photographs of the samples, gave me any basis for setting aside this finding of fact by the Special Master.

The product resulting from the Cavanaugh process was, therefore, not the product produced by Rand. It was a different product conceived for an entirely different purpose, i. e., decoration, rather than heat reflectivity which was the purpose envisioned by Rand.

### (d) German patent

This is a German patent application, apparently of I. G. Farben, which came into the possession of the Allied Scientific Teams after the war and was made available in the Library of Congress on January 16, 1948.

The claim of the patent is for a

"Process for improving especially for decreasing the heat radiation of fabrics by applying to the fabrics metal and, as a binding agent for the metal, solutions or dispersions of natural resins or synthetic polymerization or condensation resins and calendering if desired."

The patent application points out that in order to diminish heat radiation, a thin metal foil may be adhered to the fabric, but that this would cause the fabric to be stiff and would cause the air permeability to suffer, which is undesirable in the case of tent material or cloth for garments. It then continues:

"Now it was found that it is possible to improve fabrics and diminish especially the radiation of heat by using as a binding agent for the metal aqueous solutions or dispersions of natural resins or synthetic polymerization or condensation resins and calendering if necessary. The result of this is that the metal lies free on the surface of the fabric, as the aqueous dispersion retires mainly to the capillary space between metal and fabric fiber, thus being located on the lower side of the metallized surface."

It points out that suitable metals to be used are finely subdivided metal bronzes preferably in the shape of little leaves for the individual particles, such as aluminum alloys containing aluminum, copper, tin, silver, etc.

The Special Master found as a fact that:

"The process here disclosed is not used either by the patentee Rand or by plaintiff or by defendants who find, contrary to the stated experience of the German patent applicant,

not to impregnate the threads or fabric." This is not fully correct. Cavanaugh's patent is ambiguous. While Cavanaugh teaches, on the one hand, that the threads are not to be impregnated, it appears, on the other hand, that he ex-

pected that the fabric would be impregnated with the bronze powder, which would also imply that the interstices between the threads would be impregnated with the powder.

that the desired lowering of the heat radiation capacity and consequent increased insulating effect is attained without any such procedure, i. e., with the binding agent in an organic solvent rather than in aqueous solution or dispersion." (M.R.App. x, xi).

Here again the question would be whether a product produced under the German process would be substantially the same as the product produced by the method described by Rand. There was no evidence that any product ever was produced under the German patent. The Special Master pointed out that, under the circumstances, there would be no way of knowing whether the several interstices and air pockets specified in the claims of Rand's patents would, in the process outlined in the German patent, be filled up, or bridged over, by the soaking in of the binding agent.

Here again the German patent pointed out the problem and suggested a way of meeting it, but as far as can be seen the method suggested was different from that of Rand and there was no proof that the product produced under the German patent, if one ever was produced, was similar to the product produced under the Rand patent. The Special Master concluded:

"The disclosure of the German application falls far short of that certainty and precision which is necessary in a prior patent or publication brought forward as an anticipation." (M.R.App. xi).

With this conclusion, I must agree.

(e) *Prior use fabrics*

The defendants submitted certain fabrics which had been produced before the issuance of the patent. Defendants contended these fabrics were so similar to the Rand product as to constitute anticipation. None of the fabrics was used as a garment or garment lining. They consisted of (1) an ironing board cover, (2) cloth for deck chairs, and (3) a porous trim cloth.

The Special Master examined the fabrics and found that none of them was comparable with the fabric produced under the Rand patent. He found that the ironing board cover and the deck chairs fabric did not retain pliability and that there was no evidence as to the degree of their heat reflectivity. The Special Master further accepted the testimony of Dr. Reiman to the effect that the samples showed that the flakes filled most of the interstices and, in fact, in the case of the ironing board cover, seeped through the fabric so as to be visible on the uncoated side. The Special Master pointed out that the porous trim cloth was a coarse, heavy, stiff material used for structural purposes in airplanes, which is coated on both sides of the fabric, and is apparently coated by a dipping or immersing process.

The Special Master found that none of these fabrics constituted an anticipation, and having examined the exhibits and heard the argument thereon, I see no reason to upset his finding of fact on this issue.

4. *Are the Claims of the Patent Invalid for Indefiniteness*

The defendants urged before the Special Master that Rand's original applications in the Patent Office were insufficient disclosures of the invention which he subsequently claimed by amendment, and that hence the claims in the patent are invalid. The Special Master held as a fact that the subject matter was sufficiently disclosed in the original applications, and that the amendments made no material addition to or variance from the original disclosure but merely made explicit that which was originally implicit (M.R. p. 20). See Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, at page 34, 63 S.Ct. 1393, 87 L.Ed. 1731, rehearing denied 1943, 320 U.S. 809, 64 S.Ct. 25, 88 L.Ed. 489.

In their brief before the Court, the defendants do not press this original point, but urge instead that the claims are invalid on their face for indefiniteness. The claims for the product appear on their face to be drawn with precision. In fact, the defendants, in urging lack of infringement, rely upon the precision

of the claims to support their contention that Temp-Resisto is not an infringement. The Special Master made a detailed analysis of the claims (M.R. pp. 6—15). There seems to be no substantial basis for contending that the claims of the patent are indefinite, or that they fail to describe with definiteness the product covered by the patent.

The only points urged by the defendants to establish indefiniteness are (1) that the composition of the binder is not specified precisely; and (2) that the claims refer to the "interstices and the surface of the fibrous warp and weft threads at said points of intersection being *substantially* free from said metallic flakes" (emphasis added).

The specifications point out:

"The choice of binding agents is wide, and with the common solvents permits a wide variety of combinations which allows for adjustment of volatility of the composition to match the processing of the fabric."

Examples are given of numerous binding agents which could be used, but these are given as examples only, and the specification states:

"Briefly the composition to be used for spraying the coating on the fabric should be of a viscosity which permits it to break up into a cloud of discrete droplets and the volatility of the solvent should be such that it evaporates substantially as fast as the composition strikes the fabric."

The term "binder" is well known in the art. The type of binder to be used under the patent was obviously not limited, nor did the type of binder constitute the invention. Sufficient instructions were given in the specifications to determine the type of binder to be used, taking into consideration that different types of fabrics might be used, and the claim was

not indefinite for failing to limit the binder to any particular preparation.[2]

Nor does the use of the word "substantially," as limiting the phrase "free from said metallic flakes," make the claim indefinite. Expressions quite as indefinite as "substantially" have been recognized by the Supreme Court as sufficient in patent claims. Eibel Process Co. v. Minnesota & Ontario Paper Co., 1923, 261 U.S. 45, 66, 43 S.Ct. 322, 67 L.Ed. 523; see Musher Foundation, Inc. v. Alba Trading Co., Inc., 2 Cir., 1945, 150 F.2d 885, 889; certiorari denied 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465.

5. *Is the Patent Invalid for Lack of Utility*

Defendants claimed on oral argument before the Court, and claim in their brief, that the Rand patent is invalid for lack of utility. Their argument is that the product described in the patent would have no heat retention characteristics and would not, in fact, retain radiant heat from the body. Defendants urge that the metallic fabric has no heat reflective utility whatsoever and that its commercial success is due merely to an advertising campaign which has attributed this characteristic to it without proper justification.

This is, of course, a question of fact. The Special Master established the heat reflectivity of the Temp-Resisto sample by inter-partes measurements of its reflectivity for infra-red rays of wave length representative of body heat radiation, which he said may be taken as a measure of the capacity of the fabric to retain body heat. The measurements showed that the reflectivity of any one of the uncoated fabrics would be in the neighborhood of 8%, whereas the reflectivity of the metallic fabric approximated 30–35%, which is a significant increase. (M.R. p. 47; M.R. on Recommittal pp. 12–14). The Special Master

2. As in the case of any other claim, a product claim may, and indeed must, be read upon the specifications: its terms are no more than a shorthand from the fuller explanation which the specifications should contain. Musher Foundation, Inc., v. Alba Trading Co., Inc., 2 Cir., 1945, 150 F.2d 885, 888; certiorari denied 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465.

concluded that Temp-Resisto is a heat reflective fabric in the sense of the patent, and is "a fabric whose heat reflectivity and its body-heat retaining ability has been significantly increased by application of the specified 'discontinuous film composed of a multiplicity of heat reflective metallic flakes.'" (M.R. on Recommittal, p. 16).

This conclusion reached by a Special Master with scientific training after tests conducted in the presence of opposing counsel and their experts is entitled to great weight. I see no reason to conclude that his determination was erroneous, or to accept the argument of the defendants that a product made under the Rand process would not increase the heat reflectivity of the fabric.

I might point out that it seems indeed strange that the defendants should urge that the product has no heat retention utility when their own advertising for their product describes it as a product "that gives added warmth when it is cold by keeping the body heat inside the garment—provides warmth without weight or bulk;" or as in another advertising circular when they describe the product in the following language: "They give added warmth in cold weather by reflection of the body heat—cooler comfort when it is warm in the sun by deflecting the sun's rays.

### 6. Test of Validity of a Patent

■ An essential requirement for the validity of a patent is that the subject matter display "invention," which is sometimes defined as "more ingenuity * * * than the work of a mechanic skilled in the art." Sinclair & Carroll Co., Inc. v. Inter-Chemical Corp., 1945, 325 U.S. 327, 330, 65 S.Ct. 1143, 89 L.Ed. 1644. The invention must constitute a "substantial innovation * * * an innovation for which society is truly indebted to the efforts of the patentee." Ibid.

The record in this case shows that for many years persons in the textile field had been seeking a fabric which, by application of metal thereto, would become heat reflective and at the same time retain porosity, pliability, permeability to body moisture, and be dry-cleanable. Government commissions had worked on the problem. Articles had appeared in publications in the textile industry. Research had been done in this field. Some of the previous work had pointed in the direction which Rand took, but none of them solved the problem of such a fabric and, as far as appears from the record, no one had produced, prior to Rand, a fabric which met these needs. We have, therefore, in this case, as the Special Master found, "a recognized want of a product having the qualities of the patented product coupled with unsuccessful attempts to produce it. (M.R. p. 45).

When Rand produced such a product, he had made a substantial innovation which none of those skilled in the art had theretofore achieved. The new product met with immediate wide commercial acceptance. A new industry came into being. In each succeeding year there was a great increase in sales of the product. Over ninety converters were licensed by Deering, Milliken to sell the product. Royalties received by Deering, Milliken have exceeded $3,650,-000.

■ It is true that commercial success is not a test of invention and is only a makeweight when the issue of patentability is close, Jungersen v. Ostby & Barton Co., 1949, 335 U.S. 560, 69 S.Ct. 269, 93 L.Ed. 235. Nevertheless, the fact that the product, which no one had produced before Rand, was thereafter produced in substantial quantities and found a ready market in the highly competitive and price conscious apparel field is an additional indication that the product was in fact an innovation, that it was useful, and that it was a product that the industry had not theretofore been able to develop. See Coltman v. Colgate-Palmolive-Peet Co., 7 Cir., 1939, 104 F.2d 508, 511; C. Howard Hunt Pen Co. v. Radiant Point Pen Corp., 2 Cir., 1943, 135 F.2d 870, certiorari denied 320 U.S. 773, 64 S.Ct. 80, 88 L.Ed. 464.

The Court affirms the findings of the Special Master that the Rand patent was

not anticipated (M.R. p. 44) and that the claims of the patents in suit are valid (M.R. p. 119).

## II. Have the Patents been Infringed by the Defendant

### 1. The identical nature of the Milium and Temp-Resisto fabrics

Defendants do not deny that the product sold under the name of Temp-Resisto is essentially the same product as that sold under the name of Milium and that both are produced in substantially the same way. Their identity undoubtedly arose from the fact that Kaplan, in May, 1950, submitted samples of Milium to Southbridge Finishing Co., his manufacturer, which analyzed the samples and by March 1952 reported to Kaplan that they had developed a product which would equal Milium for quality (Plaintiff's Ex. 144).

When Murray Kaplan was asked in 1953: "What is the difference between Temp-Resisto and Milium?", he replied: "There is no difference, they are absolutely identical * * *" (M.R. p. 45).

### 2. The fabrics as within the scope of the patent

Defendants do not deny that the products are identical. Their position is that Milium is not a product which exemplifies the patent and that, therefore, neither plaintiff's product nor defendants' product would constitute an infringement of the patent. Defendants' contentions with respect to this issue fall into four categories: (a) that Temp-Resisto is not reflective to heat radiated from the body in the meaning of the patent; (b) that both products use nitrocellulose as a binder, and such a binder is excluded from the patent in suit; (c) that the products are not porous in the sense in which that term is used in the patent; and (d) that the products are produced by a knife coating method, rather than a spraying method, and the result is that the metallic particles are scraped off the mounds of the thread and down into the interstices, and that, therefore, a product produced by

this method does not infringe the claims of the patent which define the patented fabric, in part, as having "the outer exposed surfaces of the threads * * * being substantially completely covered by the discontinuous heat reflective metallic film" and "the surfaces of the fibrous warp and weft threads at said parts of intersection being substantially free from said metallic flakes."

In the Rand patent the spray method for producing the product is taught. However, before the patent was issued, Deering Milliken had abandoned the spray method in producing Milium and had adopted the knife coating method. Temp-Resisto has always used the knife coating method for producing its product. Defendants argued vigorously that a product made by the knife coating method would be one in which the interstices and the surfaces of the fibrous warp and weft threads at points of intersection would not be substantially free from metallic flakes, and that therefore it would not be a product which was porous, or a product described by the patent.

Both Deering Milliken and Temp-Resisto also used nitrocellulose as a binder. The defendants contend that such a binder was not transparent to radiated heat and was excluded in the patent in suit.

These points were argued at considerable length before the Court and it appeared to the Court that there were certain issues of fact which had not definitely been decided by the Master's first Report and that these should be recommitted to the Master for determination. The Court, therefore, recommitted the Report to the Special Master, pursuant to Rule 53(e)(2) of the Rules of Civil Procedure, with instructions that findings be made on the following three issues of fact:

1. Is Temp-Resisto a product in which the interstices and the surfaces of the fibrous warp and weft threads at points of intersection are "substantially free from said metallic flakes"?

476

2. Is Temp-Resisto as made by the knife coating method a product which is "porous" in the sense in which that word is used in the patent?

3. Is Temp-Resisto made with a nitrocellulose binder a fabric which is reflective to heat radiated from the body?

Although these points had been argued at great length before the Court, none the less when the Report was recommitted to the Master for findings of fact on these issues no evidence was offered on Issue No. 1 or Issue No. 2. The Special Master found that despite the fact that the Temp-Resisto product was made by the knife coating method the interstices and the surfaces of the fibrous warp and weft threads at the points of intersection are substantially free from said metallic flakes. He also found that the Temp-Resisto product, made by the knife coating method, is a product that is "porous" in the sense that word is used in the patent. He further found that Temp-Resisto, as made with a nitrocellulose binder, is a fabric which is reflective to heat radiated from the body in the sense of the patent, i. e., that it retains this heat and radiates it back to the body. (Findings of Fact on Recommittal, dated July 1, 1957).

Exceptions have been made to these findings and briefs have been submitted and argument held. The Court concludes that the Master was correct in his findings of fact. He made them after hearing testimony, examining the exhibits and making certain tests. His findings of fact are clear and supported by the evidence.

We have a situation where the defendants admittedly copied the product of the plaintiff. Although they produced the product by a process somewhat different from that described in the patent, they produced it by the same method which the plaintiff was then using to produce that patented product. The Special Master has found from the evidence, and the Court agrees with the Special Master, that the product so produced was the product covered by the claims of the patent and that the difference in the processes used was not such as to make the product a different one from that described in the patent.

The Court affirms the findings of the Special Master that the claims of the patent, except claims 4, 5 and 6 of Patent No. 2,630,620, have been infringed by the defendants. (M.R. p. 119). The dates of the infringing acts are shown at pages 60 and 61 of the Special Master's Report.

Defendants now urge before the Court that neither Milium nor Temp-Resisto has any special heat retaining characteristics and that therefore the product is a useless product and not susceptible of patentability. Apparently defendants sought to raise the same issue before the Special Master on recommittal by certain questions addressed to an expert. The Master rejected this testimony on the ground that it related to issues that had not been recommitted to him. It is correct that this issue was not recommitted to him; there was no necessity for doing so, for the original Report of the Special Master shows that he found, on competent evidence produced before him, that the fabric was a useful and substantial innovation displaying more ingenuity than the work of a man skilled in the art (M.R. p. 44), and that it was a useful product. In his Report on Recommittal the Special Master referred to the scientific measurements of the "quality of reflectivity." He says that

"Such tests were made at the trial and have been repeated on the recommittal, and they show that the metallic coating adhered by a nitrocellulose binder in Temp-Resisto does increase the reflectivity of the fabric over that of a fabric not having the metallic coating. This increase of reflectivity, from about 8% to about 32–35%, is accompanied by a corresponding decrease of the emissivity of the coated side of the lining and accounts for the heat retention properties of the lining with respect to heat coming to the lining from the body."

(Findings of Fact on Recommittal, p. 14).

Defendants then go on to argue that even if the product is heat reflective, the range of its reflectivity is so low as to prevent its use as an effective or useful heat barrier. They urge that research during the war showed that unless a metallized surface gives a fabric a reflectivity of at least 60% it has no usefulness in clothing. It is perhaps sufficient to point out that standards of utility adopted by the military or in wartime are not necessarily determinative of what might be deemed useful for ordinary attire by civilians. An increase in reflectivity from 8% to about 32–35%, while not indicating the perfection that scientists might desire, is nevertheless not so insignificant that it may be denominated as ineffective or useless as an insulating or heat reflecting medium.

The question as to whether Milium— and also Temp-Resisto—is of utility in retarding the heat loss from the body is, of course, a question of fact. It can be determined much more readily by scientific tests, such as those made before the Special Master, than it can by philosophic argument. The Special Master found the facts upon competent evidence and the Court can see no basis for overruling his findings of fact.

Furthermore, as the Special Master pointed out, the defendants paid to the patented fabric the tribute of imitation, and in their advertising and their sales promotion extolled the novelty and value of the lining and attributed to it the advantage of heat insulation which they now, in the midst of litigation, deny.[3] (M.R. p. 45).

Defendants further contend that the nitrocellulose binder which they use is excluded from the patent in suit and hence their product cannot be an infringement of the patent. In support of this defendants say that nitrocellulose is not one of the binders specified in the patent and that it does not come within the general specifications for binders. They also argue that nitrocellulose is not transparent to radiated heat, and that the doctrine of file wrapper estoppel is applicable since Rand took the position before the Patent Office that nitrocellulose would be "inoperative" in the instant invention.

The specifications state:

"The binding ingredient for holding the metallic flake in place may be any film forming polymer. * * *"

It is not denied that nitrocellulose is a film forming polymer. See Hackh's Chemical Dictionary (3rd Ed.) pp. 178, 672. Therefore, nitrocellulose falls within the language of the specifications. That nitrocellulose is not one of the binders given as one of the illustrations in the specifications does not mean that it is excluded from the patent. Defendants, in fact, do not press this aspect of their nitrocellulose claim, and this claim is essentially similar to their argument I have already disposed of above where I hold that the patent is not invalid for indefiniteness. See discussion, supra, at I(4). See also Musher Foundation, Inc., v. Alba Trading Co., Inc., 2 Cir., 1945, 150 F.2d 885; certiorari denied, 326 U.S. 770, 66 S.Ct. 175, 90 L.Ed. 465. In light of that discussion, and in the absence of other considerations, the use of nitrocellulose, as a film forming polymer and binder well known to the art, would seem clearly within the specifications of the patent. Even if it could be shown that a nitrocellulose binder was not within the patent's specifications for binders, this is an appropriate case for the application of the doctrine of equivalents. See, e. g., Celluloid Corp. v. Libbey-Owens-Ford Glass Co., D.C. N.D.Ohio 1941, 40 F.Supp. 840.

However, defendants strenuously urge that Rand himself has taken the position in the Patent Office that nitrocellulose would be inoperative in the Rand patent, and defendants therefore contend that a

3. Thus they advertised that "It keeps you Warmer in Cold Weather and Cooler under the Sun." (Findings of Fact on Recommittal, p. 9).

product made with nitrocellulose would not be an infringement of the Rand patent.

The circumstances under which this statement was made were as follows:

On March 6, 1951, the Claim Examiner of the Patent Office rejected certain of the claims of Rand "as being unpatentable over Juel, Wiggin, Cavanaugh, Allan et al. or Humes, each of which discloses a fabric coated with a binder and metal particles." (Plaintiff's Ex. 6, p. 26).

On November 28, 1951, Rand's patent attorney filed a certain supplemental amendment to his application which included claims limiting the binder to one which is "transparent to radiated body heat." In support of the application, the attorney for the applicant stated, in part:

"The instant claims are plainly distinguishable over Cavanaugh. Claims 12 to 15, 17 and 18, describe a product wherein the metallic layer is so applied that it creates an air pocket between the inner surface of the flakes and the outer surface of the weave. This is not found in the Cavanaugh patent. Furthermore, Cavanaugh makes no mention of any conception of treatment of the fabric itself, in conjunction with the use of radiation reflective materials, so as to leave the material openings between warp and weft, and in the threads themselves, free and unobstructed. It is of even greater significance that the limitation appearing in claims 14 to 16, inclusive, to the effect that the binder be transparent to radiated heat, is not to be found in Cavanaugh. On the contrary, the patentee explicitly teaches commercial cellulose paste as the binder. Such a compound is definitely non-transparent to radiated heat, and would be inoperative in the instant invention. The reference is therefore inapposite to the instant invention. It is felt that the Examiner must agree that these new claims do not read upon the Cavanaugh patent." (Plaintiff's Ex. 6, p. 40)

The attorney for applicant further said that references to Juel and Allan et al. were inapposite since they did not refer to the binders mentioned as being transparent to radiated heat.

Defendants urge that this position taken by applicant's attorney in the Patent Office proceedings establishes non-infringement in two ways: (1) as some evidence that nitrocellulose is in fact not transparent to radiated heat, and (2) as evidence that nitrocellulose, regardless of its actual transparency to radiated heat, was deemed inoperative by the patentee and hence is excluded from the patent.

The Patent Office rejected the amendments to the claims on the ground that they contained new matter which was not implicit in the original claims as filed. This action by the Patent Office meant nothing more than that the Patent Office did not consider transparency of the binder part of the original invention. It must be concluded that, so far as the Patent Office was concerned, the question as to whether the binder had to be "transparent to radiated heat" was not an essential part of the invention of the product.

The Master has found as a fact, after scientific tests conducted by him in the presence of both sides, that Temp-Resisto as made with a nitrocellulose binder was a product which was reflective to heat radiated from the body in the sense of the patent. I find that the use by both parties of such a binder does not prevent a product so made from being covered by the patent.

The conclusion of the Special Master that the defendants have infringed the patent is affirmed.

III. If the Patents are Valid and Have Been Infringed by the Defendants, Were the Actions of the Plaintiff Such as to Prevent Enforcement by Plaintiff of Its Rights Under the Patents?

■ Defendants advance the defense of "patent misuse" to the claim for infringement. Defendants urge that a misuse of the patent bars is enforce-

ment in an infringement action. Standard Register Co. v. American Sales Book Co., Inc., 2 Cir., 1945, 148 F.2d 612, certiorari denied, 1945, 326 U.S. 732, 808, 66 S.Ct. 40, 90 L.Ed. 436; National Lockwasher Co. v. George K. Garrett Co., Inc., 3 Cir., 1943, 137 F.2d 255; Morton Salt Co. v. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363. As "patent misuse" they refer to certain separate activities of the plaintiff. They urge in their answer that the patents are rendered nonenforceable by plaintiff's "unfair, inequitable and illegal conduct in connection with the obtaining of said patents, and licensing activities under the applications for said patents and related patents and applications and plaintiff's trade-mark 'Milium,' and in connection with the institution and conduct of this suit and the campaign of customer-intimidation and unfair competition launched by plaintiff with the filing of this suit," and, more particularly, by plaintiff's use of the patents in a conspiracy to restrain trade and to violate the anti-trust laws, by (1) granting licenses which require the licensees to purchase unpatented materials from plaintiff and which fix prices for the sale and resale of unpatented commodities; (2) combining the purported monopolies of several patents, pending patent applications and a trade-mark to effect illegal restraint of trade and competition; (3) bringing one suit on the day the patents issued and another three days later, and before it had taken any steps to ascertain whether or not defendants or either of them had committed any of the acts charged to infringe said patents and (4) releasing a flood of publicity designed to intimidate defendants' customers.

These general charges of patent misuse are, of course, merely accusations and unless supported by competent evidence must be disregarded.

The Master, having heard the evidence and having read the briefs and listened to arguments of counsel, reached the following conclusions on this issue:

"1. On March 10, 1953, the date of issuance of the patents, no monopolistic or otherwise illegal situation in violation of U.S.C. Title 15 or actionable under 28 U.S.C. [§] 1338 had been created by the conduct of Deering Milliken or of the Additional Defendants, or either or any of them.

"There was no illegal situation of which the patents when issued became an integral part, and consideration of the question of patent abuse must therefore rest upon the conduct of Deering Milliken since the patents issued.

"2. There is no illegality in the licensing system and, particularly, the converters' licenses are not illegal by reason of their limitation to fields of use or because they reserve to the licensor the option of cancellation if the licensee infringes.

"3. The current Advertising procedure of Deering Milliken has not been shown to be discriminatory in violation of Robinson-Patman 2(d) or 2(e) [15 U.S.C.A. § 13], and it complies with the statutory requirement of availability.

"Thus there has been no misuse of the patents which would warrant withholding an injunction."

A study of the record by the Court and careful consideration of the arguments and briefs, leads the Court to the conclusion that the Master is correct.

The undisputed facts show that trade in metal insulated garment linings was initiated in 1950 by Deering Milliken with the introduction of Milium. In the garment trade converters buy so-called "greige goods" from the mills, dye them and finish them and thus convert the "greige goods" to "plain goods;" they then sell the plain goods to garment manufacturers.

As part of the Milium promotion plan, Deering Milliken arranged for an associated company, Excelsior Mills, to process the plain goods for converters and to apply the metal insulation to such goods,

according to its process. Excelsior paid a royalty to Deering Milliken and charged a processing charge to the converters for this processing operation. The processor's license by its terms did not prevent the processor from dealing with non-licensed converters, but processing was in fact done only for licensed converters. Title to the plain goods remained in the converters. The converters were permitted to sell such processed plain goods to garment manufacturers approved by Deering Milliken and sample garments were to be submitted by the manufacturers to Deering Milliken for approval. The defendants urge that the system by which converters could sell only to manufacturers approved by Deering Milliken was an illegal extension of the patent monopoly and that the rewards of the patent were exhausted when Excelsior applied the metal lining to the plain goods and received a processing charge therefor. This contention will not stand up as a matter of fact or as a matter of law. Deering Milliken, to the extent that it had patent rights, had a right to license a mill of its own choice to make the patented product and also the right to license converters of its own choosing to sell the product.

Furthermore, two patents were involved, one on the garment fabric and one on the garment itself comprising the outer fabric with an inner lining of the heat reflective fabric of the type described in the first patent. The converters were, in effect licensed to secure the product by having their plain goods processed and to sell the product; the manufacturers of garments had to be approved by Deering, Milliken for, if not, they might have been infringing the second patent by selling garments which embodied the patented fabric and might have been subject to a claim for infringement. Deering Milliken had the right to determine which manufacturers should be licensed to so manufacture the garments, and it protected the converters by providing that the processed fabric

be sold to manufacturers which it had approved.

Furthermore, the Master found that there was a good business basis—not activated by a desire to extend the patent monopoly—which led to this system for introducing Milium to the garment trade. The approval system was adopted, so it was testified, because the idea of metal insulated linings was then unknown to manufacturers and retailers of apparel and Deering Milliken wished to maintain a distribution that would adhere to the quality standards for the best utilization of these linings. Deering Milliken felt it was necessary to have garments submitted to them so that they could make sure that the resultant product was a proper one for the claims they were making for Milium; otherwise, the inclusion of Milium linings in garments not suitable or proper might reflect on the Milium trade-mark.

The garment approval requirement lasted for only one season—the Fall season of 1950; the requirement that garment manufacturers be approved remained in effect until October 1952. The patents were not issued until March 10, 1953. Upon the issuance of the patents Deering Milliken discontinued processing by Excelsior and licensed two new processors to apply the heat reflective coating to plain goods. They extended distributor licenses to converters generally.

The defendants further contend that the system of licensing converters was illegal by reason of the fact that (1) the license of Deering Milliken gave it the right to terminate the license if the licensee sold any "metal insulating linings which infringe Milliken's patent rights or the trade-mark Milium," and (2) that Deering Milliken licensed the converters to sell in specified fields, such as linings for apparel, linings for bed covering, linings for gloves, for footwear, etc., and in certain cases Deering Milliken licensed some converters to sell only in the export trade.

██ Neither of these provisions in the license seems to be illegal. A license

giving to the licensor a right to terminate the license if the licensee infringes the licensed patent is not illegal. Steiner Sales Co. v. Schwartz Sales Co., 10 Cir., 1938, 98 F.2d 999, 1009; United Lens Corp. v. Doray Lamp Co., Inc., 7 Cir., 1937, 93 F.2d 969, 973; Daniels v. Brown Shoe Co. Inc., 1 Cir., 1935, 77 F.2d 899. Furthermore, a licensor can grant a license to sell in certain areas of trade or in certain geographical areas, and a license so limited is not illegal. General Talking Pictures Corp. v. Western Electric Co., 1938, 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81; Becton, Dickinson & Co. v. Eisele & Co., 6 Cir., 1936, 86 F.2d 267, 269; see Report of The Attorney General's Committee to Study the Antitrust Laws, pp. 236–37 (1955).

Deering Milliken properly points out that in the apparel field, which is the major area of use for Milium linings, it has granted many licenses and that it also granted multiple licenses to a number of licensees, and has made no effort to restrict competition between converters. The export license granted by it contained no territorial restrictions but was a license to buy and sell in the United States for the export market, which activity, if not licensed, would infringe the patents.

Defendants did not offer any competent evidence which would establish that the licenses granted by Deering Milliken required the licensees to purchase unlicensed material from the licensor,[4] or fixed prices for the sale or resale of unpatented commodities.[5]

It is interesting that defendants' claims of patent misuse rely almost entirely upon activities prior to the issuance of the patents. Furthermore, in this earlier period none of the activities complained of seem to have restrained competition in the heat reflective lining field or to have given Deering Milliken a monopoly in that field. Although there had been no trade in metal insulated linings until Deering Milliken introduced Milium in 1950, such linings had become an established article of commerce by the end of 1951. Thereafter, until the patents were issued on March 10, 1953 a number of competing firms started the manufacture and sale of heat reflective linings. Prior to the issuance of the patents there were 17 competitive fabrics on the market, in addition to defendants' Temp-Resisto. Temp-Resisto sales, which in February 1952 amounted to 4,048 yards, grew to a total at the end of 1952 and the first months of 1953 about equal to the total sales of Milium by the authorized Milium distributors.

When the patents were issued Deering Milliken extended licenses to 8 of the pre-patent competitors. The other competitors, except Kaplan, went out of business. Kaplan continued in business. To the extent that Deering Milliken, aside from the Kaplan competition, now has a practical monopoly in the field, it is a monopoly derived from its patent rights and not from any misuse prior to the issuance of the patents.[6] Nor can it be said that Deering Milliken violated any rights of the defendants in bringing

4. The Special Master said: "In other words, Kaplan failed to discharge the burden of proving that the Additional Defendants' purchases of greige goods from Deering Milliken were on obligation of a prior agreement rather than in response to the unfettered exercise of their individual judgments." (P. 79)

5. The Special Master stated that after examining the record and the briefs, "I am left with the firm conviction that there was no price-fixing by agreement; that the substantial uniformity of the distributors' prices was the result of independent action of the Additional Defendants each exercising his own business judgment, i. e., the so-called 'conscious parallelism.' " (P. 98)

6. The Special Master pointed out that "The charge was withdrawn that the Deering Milliken plan resulted in monopolization in the insulated lining fabric trade, in which there was open and effective competition when the patents issued, and it is equally clear that there had been created no monopolistic status of which the patents became in any sense an integral part." (P. 78)

the infringement suits on the day the patent was issued and 3 days thereafter. 66 Stat. 811 (1952), 35 U.S.C.A. § 271 (1954).

IV. Have the Defendants Established an Independent Cause of Action Against the Plaintiff and Additional Defendants for Violation of the Anti-trust Laws or for Unfair Competition, as Charged in the Second and Third Counterclaims in Defendants' Answer?

■ These counterclaims raise, in essence, two issues: (1) Was there in fact an illegal agreement between Deering Milliken and the additional defendants in violation of the anti-trust laws, and (2) Were any of the activities of Deering Milliken or the additional defendants illegal as a matter of law?

The Master made a careful analysis of the evidence and reached conclusions as to the issues of fact which the Court finds to be correct.

He found no evidence of any illegal conspiracy between Deering Milliken and the additional defendants. (Pp. 78, 98, 119).

The Court has considered the briefs, the testimony and the exhibits and finds no grounds for overturning this finding.

■ The method of production and distribution adopted by Deering Milliken was not illegal. This point has heretofore been discussed. Kaplan's principal objection seems to be that Deering Milliken would not accept him as one of its distributors. However, it is well established that a patent owner may choose his own licensees and that a manufacturer is not under an obligation to make everybody his distributor. As the Special Master said: "It seems to me unrealistic to speak of the Deering Milliken plan of distribution of Milium as a 'boycott' in any invidious sense of unreasonable restraint of trade. Of course, in one sense, any choice of customers for a product emanating from one productive source could be referred to as a boycott of all unchosen customers, but here the choice by Deering Milliken through its distributors of customers for trade-mark Milium had no effect to restrain the development or the sale of competing heat reflective garment fabrics; its effect was quite the contrary." (P. 78).[7]

The charge that Deering Milliken engaged in a price-fixing program is not supported by the facts. The Master found that "there is total lack of convincing evidence that the amount of the processing charge, or of any reduction of it, was fixed by prior agreement with the Additional Defendants or any of them." (P. 91). Nor is there competent evidence that Deering Milliken fixed any prices to be charged by converters or manufacturers. Defendants' principal argument on this point was that from time to time the converters urged Deering Milliken to reduce the processing charge so that they could in turn reduce the price of the processed fabric sold by them to the manufacturers in order that they could increase sales by reaching wider markets; and when Deering Milliken did reduce its processing charges this reduction was passed on by the converters by reducing their prices to an amount equal or greater than the reduction in the processing charges. There would seem to be no violation of the anti-trust laws in a customer (in the position of a jobber, for example) suggesting that the manufacturer reduce his prices and indicating that if such reduction were made a reduction would be passed on to the jobber's customers and then, when his cost is reduced, passing on the saving by reducing the price to his customers.

There is no doubt that Deering Milliken built up a large market for Milium. It had a right to do so. There is no doubt that Deering Milliken issued various licenses to processors and converters. It had a right to do so. Also there is no doubt that Deering Milliken refused a

7. The Special Master also found that there was no proof that this distribution pro-

gram caused damage or injury to Kaplan. (P. 78).

license to Kaplan. It had a right to do so.

Kaplan and Temp-Resisto have also come forward with a counterclaim which charges that Deering Milliken has violated the Robinson-Patman Act (15 U.S.C.A. § 13). Defendants contend that Deering Milliken engaged in discriminatory advertising programs, both before and after the issuance of the patents, and that these programs damaged them and entitled them to recover under the Robinson-Patman Act. Defendants further contend that these programs constitute a part of the conspiracy to restrain trade and a misuse of the patent.

The Special Master found a lack of concrete evidence on the subject of discriminatory advertising (p. 84). As to the conspiracy charge, the Special Master found no evidence of conspiracy in that the converters were not consulted by Deering Milliken, and there was "no proof that any converter knew the terms made by Jolly [Deering, Milliken] with any manufacturer, much less that those terms were discriminatory." (P. 85). As to the issue of misuse, the Master found no evidence of misuse. He found that the advertising program prior to the issuance of the patents was not shown to have any relation to the post patent situation, nor was there any persuasive evidence that a situation had been created which would serve as a basis for the misuse of the patent, after its issuance, in furtherance of an unlawful plan and purpose of which the patents formed an integral part. (Pp. 82, 88). The Master further found that the plaintiff's post patent retail advertising program had not been shown to violate the Robinson-Patman Act requirements and, even if there had been such a violation, the Special Master found that the Deering Milliken advertising programs were not directly related to Deering Milliken's lawful enjoyment of its patent rights. (P. 90).

The Court, having considered the arguments of defendants, the testimony and exhibits, finds no cause to overturn these findings of the Master. There has been no showing of a conspiracy in violation of the anti-trust laws or of misuse of the patents by reason of discriminatory advertising.

As to defendants' contention that they have been damaged by Deering Milliken's advertising programs, both prior to and subsequent to the issuance of the patents, the Special Master pointed out that there was a lack of concrete evidence on the subject of discriminatory advertising. (P. 84). But apart from this, the Special Master found that Kaplan had failed to make the proof of damage which is an essential element of his attempt to recover for Deering Milliken's alleged wrongdoing. (P. 82, note). The Special Master also found no evidence to support the charge that money spent in advertising in support of the Milium trade-mark was used in an attempt to improperly influence the trade to refrain from purchasing Temp-Resisto. (P. 86).[8] Without such proof of the existence or probability of damage defendants have no standing to bring an action for alleged violations of the anti-trust laws. Only a person who has been injured in his business or property by reason of anything forbidden in the anti-trust laws has status to sue. 15 U.S.C.A. § 15.[9]

8. The Special Master also found there was no evidence in the case as to the actual effect in the competitive market of Deering Milliken's post patent retail advertising program, or that any retailer has complained that the program put him at a disadvantage with respect to his competitors (p. 90).

9. Defendants contend that the order of reference to the Special Master excluded their showing damages. The order of reference read that the Special Master "take and hear the evidence offered by the respective parties upon all the issues presented herein except damages, and to report the same together with his findings of fact and conclusions of law. * * *" The purpose of this order of reference was to avoid presenting evidence on the extent of damages until liability had been established. However, it was essential to their case that

484

This question of damages equally affects defendants' standing to sue for any alleged violations of the anti-trust laws occurring in the post patent period. We have here a situation where Kaplan and Temp-Resisto were the manufacturers or sellers of an insulated lining sold under the trade-mark and trade name of "Temp-Resisto." We have already found that the manufacture and sale of this product was an infringement of plaintiff's patents, and there was no pre-patent violation of the anti-trust laws which contaminated the patents, as defendants charge, or which had continued into the post patent period. Therefore, reducing the defendants' contentions as to the post patent period to their real substance, they are asserting that by reason of Deering Milliken's actions they were unable to infringe the patent as successfully as they might otherwise have done.

For example, defendants assert that the advertising allowances granted by Deering Milliken were discriminatory under the Robinson-Patman law, with the effect that defendants had to pay more for advertising than they otherwise would have to pay, and with the result that Milliken had certain outlets for Milium products which the defendants were unable to get for their Temp-Resisto products. The Master found that these activities were not violative of the Robinson-Patman Act. However, even if they had been technical violations of the Robinson-Patman Act, what was the business of defendants which was injured? Their business was the manufacture and sale of a product which con-

stituted an infringement under the patent laws, a business in which, under the patent laws, they had no legal right to engage. Can they claim damages because their illegal activities were made more expensive or more difficult as a result of the advertising allowances granted by Deering Milliken? I doubt it. The Robinson-Patman Act is not designed to give damages to someone injured in an illegal business activity.

 Equally fallacious are the claims of the defendants that they were damaged by the allegedly illegal combination of Deering Milliken and the additional defendants. The additional defendants were licensees of Deering Milliken. The granting of a license by a patent owner does not constitute an illegal combination or conspiracy and the evidence does not disclose any agreement or combination between them, other than that which grew out of the license agreements. No monopoly was shown to exist, for the amount of business done by the defendants up to the time of the issuance of the patents was equal to that of the distributors of Deering Milliken's product.

 The defendants also claim that the institution of this action is a part of the conspiracy to violate the anti-trust laws, but it is well-established that a patentee is not guilty of misuse of a patent when it brings an infringement action in good faith. Cole v. Hughes Tool Co., 10 Cir., 1954, 215 F.2d 924, certioari denied, 1955, Ford v. Hughes Tool Co., 348 U.S. 927, 965, 75 S.Ct. 339, 99 L.Ed. 726; Jacquard Knitting Mach. Co., Inc.,

---

defendants make a showing that there were some damages to Temp-Resisto or a clear prospect of damages. This is a necessary preliminary showing in a civil suit under the anti-trust laws. The order of reference excluded only the necessity that the Special Master determine the measure of damages; it did not avoid the requirement that defendants show the fact of damage.

This issue was argued before the Special Master so defendants cannot claim any element of surprise. Defendants concede that in response to the Mas-

ter's suggestion, they did endeavor to demonstrate that the conduct of the plaintiff and additional defendants was injurious to them in its nature, and in addition, they endeavored to introduce proof of specific damage. Defendants, in fact, contend that they have succeeded in showing the fact of damage. In three instances, however, the Special Master found that the defendants failed so to do. (Pp. 78, 82 note, 102). The Court finds that the testimony supports the Special Master's findings.

v. Ordnance Gauge Co., Inc., 3 Cir., 1954, 213 F.2d 503; 66 Stat. 811 (1952) 35 U.S.C.A. § 271(d) (1954). The Special Master held that the suit was brought in good faith, was devoid of any aspect of improper harassment of Temp-Resisto and was not a predatory act in furtherance of the supposed conspiracy. The Court finds no grounds which would warrant the overturning of this finding.

Defendants urge a series of separate and unrelated acts as proof of unfair competition. The Master found that they did not establish unfair competition but rather were evidence of actual competition between the parties. He found that the defendants had not established the causes of action for unfair competition and recommended that the second and third counterclaims should be dismissed.[10] The Court after reviewing the evidence believes that the Special Master is correct and that none of the instances relied upon by the defendants would entitle them to the relief they are seeking under the second and third counterclaims.[11]

Defendants have also submitted a brief, which they label a "reply brief," in November of 1957, several months after the hearings on the Special Master's Report. In this brief defendants make a new argument which raises an issue not brought before the Special Master nor before the Court at the hearings on the Special Master's Report. The Court is inclined to dismiss this argument as not timely, as it raises issues of fact which properly should have been raised at the hearings before the Special Master. However, in view of the record, the argument is so lacking in merit that the Court will deal with it directly.

Defendants move to dismiss the complaint as against the defendant Temp-Resisto Corporation on grounds that the Temp-Resisto Corporation did not infringe nor contribute to the infringement of Deering Milliken's patents. Defendants say that Temp-Resisto Corporation "played a minimal role at best; it owned the trade-mark 'Temp-Resisto', but was not involved in producing and merchandising the fabric." Defendants say the Temp-Resisto Corpo-

---

10. S.M. Report p. 119. And see p. 104 of the Special Master's Report where he says, as to some of the acts charged, that "The evidence and the briefs here take us on a realistic although limited, sight-seeing tour of competitive advertising in the metal insulated garment lining trade. The incidents of competition exposed are trivial in the extreme—some not without comedy overtones of 'the biter bit'—and do not warrant the emphasis counsel for Kaplan have bestowed upon them.

11. One of the more important claims arose from the fact that Deering Milliken's announcement of Milium to the trade on March 3, 1950 contained the statement that "the process has been protected by a large number of patents." This statement was false in that patents had not yet been issued nor had patent applications been filed; Deering Milliken had, however, been informed that some 25 applications were in the course of preparation by their patent solicitors. Defendants urge that this statement was designed to discourage others from coming into the field of metal insulated lining and was part of the attempt by the plaintiff to secure a monopoly; they also urge that this incident gives rise to the defense of "unclean hands."

The Master found that the incident in its context carried "no such taint of false or inequitable conduct as counsel for Kaplan attribute to it." (S.M. Report p. 71). The testimony shows that Deering Milliken made a stupid mistake of fact in its press release but there is no competent proof that it was done with the ulterior motive defendants attribute to it or that defendants were damaged by it. The Master had to weigh the testimony of the witnesses on this point and his findings are entitled to great weight. For example, the Master commented on the testimony of Kaplan as follows: "Mr. Kaplan is an alert and intelligent man, a graduate of Columbia Law School where he was a member of the staff of the Columbia Law Review. I carefully observed his demeanor and the phrasing of his answers to these questions and was left with the conviction that he was not telling the truth; and that his uncorroborated statements could not safely be relied upon." (S.M. Report, p. vii).

ration neither made, used nor sold the patented product nor any component thereof, and that it did not actively induce the infringement of the patent. They say that Temp-Resisto did not aid and abet the infringement of the Milium patents or do any act without which the infringement would not have occurred. In the absence of such a showing, they say the complaint against Temp-Resisto Corporation must be dismissed.

This argument of defendants cannot succeed on the facts. Although it is true that the Special Master dealt with Temp-Resisto and Samuel Kaplan & Sons, Inc. as joint defendants who had jointly contributed to the infringement of the patent, the Court finds that the facts warranted his so doing. The two corporations worked closely together in the promotion and sale of "Temp-Resisto," the infringing product, and Samuel Kaplan's activities on behalf of the one corporation are hardly distinguishable from those for the other corporation. Defendant Temp-Resisto Corporation itself stated in its counterclaims that "it was and is the owner of the trade-mark 'Temp-Resisto'; and was and is engaged in supervising the production of metallic-coated fabrics used principally as linings for garments and sold under said trade-mark." In the rest of their counterclaims defendants do not distinguish as between the two corporations. They treat the customers of Samuel Kaplan & Sons Co., Inc. and Temp-Resisto Corporation, and the damage to the two corporations, as being the same. Further, defendants themselves have presented such exhibits as a letter written by their lawyers, on behalf of Temp-Resisto Corporation and at their request, wherein they refer to advertising of the Temp-Resisto Corporation which sought to sell and advertise the patented metal insulated lining.[12] Apart from this record of infringing activities of defendant Temp-Resisto Corporation, there is no question that it did own the trade-mark "Temp-Resisto" and used it in the promotion and labeling of the Temp-Resisto

linings which the Court has held infringe the plaintiff's patents.

■■■ The Court does not understand how Temp-Resisto Corporation can therefore be heard to say that it did not actively induce nor aid and abet the infringement of the Milium patents. Nor can Temp-Resisto Corporation say it did no "act without which the infringement would not have occurred." It is clear that the Patent Code, 35 U.S.C.A. § 271, does not require the sale of the patented item but operates also against one who aids or abets the direct infringer or who directly participates in the infringement. Jones v. R. C. A., D.C.S.D.N.Y.1955, 131 F.Supp. 82. See 66 Yale L.J. at p. 138. The Special Master held that the defendants jointly have infringed the patents involved in this suit and this Court must concur in that finding on the facts.

## Conclusions

The Court concludes that defendants' exceptions to the Special Master's Report should be overruled and that the findings of the Special Master should be approved. The Court finds:

1. The Court has jurisdiction over this action.

2. All of the claims of both patents in suit are valid and all of the claims of the patents, except Claims 4, 5 and 6 of Patent No. 2,630,620 have been infringed by the defendants.

3. Defendants-counterclaimants have not proved any contract, combination or conspiracy among plaintiff and the additional defendants, or any of them, in violation of the anti-trust laws, or any monopolization or attempt to monopolize by combination or conspiracy among the plaintiff and the additional defendants, or any of them, in violation of the anti-trust laws; nor have the defendants-counterclaimants established any cause of action for unfair competition against the plaintiff or the additional defendants, or any of them, or under 15 U.S.C.A. § 15, or under 28 U.S.C.A. § 1338.

12. The Special Master discusses illustrations of such advertisements at pages 100 and 104–105 of his Report.

A decree should be entered:

(1) Declaring the patents of the plaintiff to be valid and to have been infringed by the defendants and granting the injunction sought by the plaintiff, and directing that the action shall be referred to a master for determination of damages.

(2) Dismissing the second and third counterclaims.

(3) Providing for payment of taxable costs to the plaintiff and additional defendants.

Submit proposed form of decree on five days' notice to all counsel.

This opinion shall constitute the findings of fact and conclusions of law of the Court.