MUNTERS CORPORATION, Plaintiff,

v.

BURGESS INDUSTRIES INCORPORAT-
ED and Buffalo Forge Company,
Defendants.

No. 75 Civ. 4622 (CHT).

United States District Court,
S. D. New York.

May 27, 1977.

On Reargument July 7, 1978.

Curtis, Morris & Safford, P.C., New York City, for plaintiff; John A. Mitchell, New York City, of counsel.

Morgan, Finnegan, Pine, Foley & Lee, John C. Vassil, J. Robert Dailey, John L. Welch, New York City, of counsel, Richards, Harris & Medlock, V. Bryan Medlock, Dallas, Tex., of counsel, Vial, Hamilton, Koch, Tubb, Knox & Stradley, James A. Knox, George A. Fazakerly, Dallas, Tex., of counsel, for defendant Burgess Industries Inc.

Burns, Van Kirk, Greene & Kafer, Joseph W. Burns, Martin J. Neville, New York City, of counsel, McGrath, Meyer, Lieberman & Lipp, Donald G. McGrath, Buffalo, N. Y., of counsel, for defendant Buffalo Forge Co.

TENNEY, District Judge.

Plaintiff Munters Corporation ("Munters"), a wholly-owned subsidiary of a Swedish corporation, AB Carl Munters, brought this declaratory judgment action against two of its customers, Burgess Industries Incorporated ("Burgess") and Buffalo Forge Company ("Buffalo Forge"). Munters manufacturers, under license from its Swedish parent, a cross-fluted corrugated packing material ("Munters fill") sold under the trademarks "HUMI–KOOL," "CELDEK," "PLASDEK," and "ABESdek." On October 6, 1972, Munters entered into an agreement with Buffalo Forge ("1972 Agreement") granting Buffalo Forge the "exclusive right and sub-license" to use the Munters fill in its manufacture of evaporative cooling mechanisms for gas turbines of at least 500 horsepower capacity in "the United States, its territories and possessions." 1972 Agreement, arts. I & II. Burgess, also a purchaser of Munters fill and the principal competitor of Buffalo Forge in the sale of evaporative coolers for gas turbines, objected to this exclusive arrangement and to any restrictions which it placed on Burgess's use of the Munters fill as violative of the antitrust laws and proceeded to use the fill in the manufacture of gas turbine evaporative coolers. Munters, caught between the Scylla of a breach of contract action by Buffalo Forge and the Charybdis of an antitrust action by Burgess, brought this action asking the Court to declare the agreement between Buffalo Forge and Munters legal, Complaint at 6 ¶¶ 1–3, and to approve Munters's restrictions on the use of Munters fill by Burgess. Id. ¶¶ 4–5. Following a brief trial to the Court, both Burgess and Buffalo Forge moved for judgment in their favor. In addition, on the eve of trial Burgess moved for leave to amend its answer in order to assert an antitrust counterclaim against Munters and a similar cross-claim against Buffalo Forge. Finally, Buffalo Forge now moves to reopen the record to admit an amendment to the original 1972 Agreement between Munters and Buffalo Forge.

For the reasons stated below, Buffalo Forge's motion to reopen the record is granted. Burgess's motion for judgment in its favor is also granted, and the Court declares that the agreement between Buffalo Forge and Munters violates the federal antitrust laws insofar as it attempts to limit the use of Munters fill by Burgess and other purchasers. Finally, Burgess's motion for leave to amend its answer is also granted, with the understanding that the counterclaim and cross-claim were not before this Court during the earlier trial, which was confined solely to the declaratory judgment action.

Most of the facts involved in this action are not in dispute. Munters's parent corporation, AB Carl Munters, is and has been at all times relevant to this action the owner of eight United States patents relating to

the Munters fill.[1] Munters itself was incorporated in Florida in 1965 and has an exclusive license from its parent to make, use and sell the Munters fill in the United States.[2]

In January of 1971 Munters maintained a display booth at the International Exhibit held in Philadelphia in connection with a trade association ("ASHRAE") meeting. An employee of Buffalo Forge, a New York Corporation whose Air Handling Division manufactures, inter alia, evaporative coolers, attended the show and expressed an interest in Munters fill. Subsequently, Buffalo Forge obtained samples of the Munters fill from Munters and tested them for efficiency, pressure drop, and carryover, characteristics relevant to the fill's potential for use in an evaporative cooler. As a result of these tests, Buffalo Forge concluded that the Munters fill was an excellent product and that it would be worthwhile for the company to develop a gas turbine evaporative cooler utilizing it.

At some point in 1971 Buffalo Forge informed Munters that it was interested in using the fill for evaporative coolers but requested an "exclusive license" governing its use for a time period sufficient to recoup its investment in adapting the design of its coolers to incorporate Munters fill and in marketing this new product.

In March of 1972 Robert Jorgensen of Buffalo Forge visited Ulf Nordling, President of Munters, to discuss possible terms for the agreement between Munters and Buffalo Forge. Nordling was unwilling to grant Buffalo Forge an exclusive license for the entire evaporative cooling field but said that Munters would consider a narrower product use field—gas turbines of a given horsepower. Munters was willing to grant this exclusivity since evaporative cooling for gas turbines was a wholly new area to Munters and since "Munters could not make the financial investment necessary to develop and design what was a product for entry into a new product market. Also, Buffalo Forge stated it would not undertake the development unless it received an exclusive license." Stipulation of Facts for Trial ¶ 26. The clarity of the latter point was obscured somewhat at trial, however, when Jorgensen testified that "[i]t was kind of debatable" whether Buffalo Forge would have undertaken the project without the exclusivity and that "I think we would not have done it or at least not so soon." Trial Transcript at 103 (emphasis added).

The agreement was formalized in a document dated October 6, 1972. At its core was the following provision, entitled "Grant of License":

"Subject to and to be effective when Buffalo shall have established the use of Munters' Fill as a competitive product for use in the Product Use Area, Munters Florida grants to Buffalo under the terms of this Agreement, the exclusive right and sub-license under the Fill Patents to use and sell Munters' Fill solely for use in the Product Use Area throughout the Exclusive Territory, and to sublicense others to use such licensed Munters' Fill obtained from Buffalo solely for use in the Product Use Area throughout the Exclusive Territory. Munters Florida

---

1. The following United States Patents related to the manufacture of the Munters fill:

| Patent No. | Issue Date |
| --- | --- |
| 3,262,682 | July 26, 1966 |
| 3,265,550 | August 9, 1966 |
| 3,395,900 | August 6, 1968 |
| 3,395,903 | August 6, 1968 |
| 3,450,393 | June 17, 1969 |
| 3,526,393 | September 1, 1970 |
| 3,574,032 | April 6, 1971 |
| 3,599,943 | August 17, 1971 |

2. Munters sells the fill to a wide variety of users under a "free patent license to sell and use same in all areas of the world except Scandanavia." Stipulation of Facts for Trial ¶ 5. The uses of the Munters fill include air and gas scrubbers, cooling towers, evaporative coolers, industrial humidifiers, other liquid-gas contact apparatus and waste water treatment filters. Industrial users include dairies, meat processing plants, food processing plants, tanneries, breweries, distillers, greenhouses, chemical plants, paper mills, synthetic fiber works, textile mills, slaughter houses and poultry processing plants. Id. ¶ 4. In 1975, total sales of the

reserves all other rights it may have under the Fill Patents for uses of Munters' Fill not within the Product Use Area. Nothing in this Agreement shall be interpreted or construed to grant to Buffalo or its customers any rights whatsoever to manufacture Munters' Fill." 1972 Agreement, Art. II, cl. 1.

The "Product Use Area" was defined as "evaporative cooling applications for cooling air, where the cooling of the air is obtained by evaporation of moisture therein, for gas turbines having a minimum rated capacity of at least 500 Horsepower and for the equipment connected thereto." *Id.*, Art. I, cl. b. The "Exclusive Territory" was defined as "the United States and its territories and possessions." *Id.*

The exclusivity of Buffalo Forge's right to use Munters fill in the "Product Use Area" was reinforced by several other clauses. Munters was prohibited from doing any act which would "interfere or restrict Buffalo's quiet enjoyment of the exclusive right and sub-license," such as knowingly selling to purchasers who intend to use the Munters fill in the "Product Use Area." *Id.* art. II, cl. 3; art. VII, cl. 3. Munters was charged with informing its employees, distributors, and customers of the exclusive arrangement with Buffalo Forge; in addition, Buffalo Forge was given the right to require Munters to further notify any purchaser whose use of the fill was discovered to be intruding on the "Product Use Area" that this area was exclusively reserved to Buffalo Forge. *Id.* art. III.

The 1972 Agreement did not provide for the payment of royalties by Buffalo Forge. *Id.* art. II, cl. 5. Instead, Buffalo Forge was required to purchase certain minimum amounts of the fill; these amounts were to increase throughout the life of the agreement. *Id.* arts. IV & V. Finally, the 1972 Agreement provided for its extension through a series of two-year terms, ending December 31, 1981, as long as Buffalo Forge continued to meet the minimum purchase requirements. *Id.* art. IV. Nordling testified at trial that Munters was somewhat hesitant about the potential ten-year length of the agreement but agreed, since it was felt that Buffalo Forge would not accept a lesser term. Trial Transcript at 33–34.

In April of 1973, some six months after the 1972 Agreement was finalized, Burgess became interested in using the Munters fill. Specifically, it was brought to Burgess's attention that the General Electric Company, a leading purchaser of evaporative coolers for gas turbines, had purchased a Buffalo Forge cooler utilizing Munters fill and that similar coolers were being offered to Westinghouse.[3] Ugo A. Bert, Burgess's Sales Manager, called Munters to discuss purchasing the Munters fill. In response, Munters sent Burgess a letter dated April 16, 1973 containing requested technical information, but informing Burgess that

> "Munters recently signed an agreement with Buffalo Forge Company for the exclusive use of the HUMI–KOOL fill in gas turbine air intake coolers." Exhibit BF–11.

In a further letter dated June 29, 1973, Munters transmitted a HUMI–KOOL price list to Burgess but again advised that "HUMI–KOOL cannot be applied to gas turbine applications, due to our license with Buffalo Forge." Exhibit BF–12.

In spite of these warnings, Burgess made a conscious decision to ignore the exclusive arrangement between Buffalo Forge and Munters and in the summer of 1973 proceeded to solicit customers for evaporative coolers using Munters fill and intended for the proscribed use in gas turbines. Later that year Burgess entered into head-to-head competition with Buffalo Forge over the provision of a cooler not within the "Prod-

---

Munters fill in the United States amounted to $3,490,000. Trial Transcript at 56.

**3.** According to testimony at trial, in 1971 the market in evaporative coolers for gas turbines was dominated by two purchasers—General

Electric and Westinghouse—with General Electric "obtaining the lion's share of the business." Trial Transcript at 89 (testimony of Robert Jorgensen).

uct Use Area" to a General Motors plant in California. Burgess won the contract and made its first purchase of Munters fill to construct the cooler.

In 1974 the confrontation between Buffalo Forge and Burgess escalated.[4] The specific item of contention was a contract from Westinghouse for gas turbine evaporative coolers using the Munters fill. By reducing its gross margin, Burgess was able to offer a lower price and win the contract. Burgess gave letters to Westinghouse and to another company involved agreeing to hold them harmless from any damages which might result from any legal action by Buffalo Forge concerning the use of the fill in the prohibited area. Buffalo Forge appealed to Munters to prevent Burgess from using the fill in the "Product Use Area." On December 13, 1974, Munters wrote to Burgess that

> " '[i]n order to comply with the request of its exclusive licensee, Buffalo Forge, that Munters not knowingly sell Munters' Fill to purchasers whose intended use would fall within the area exclusively licensed to Buffalo Forge, it will be required that on all purchase orders hereafter submitted by Burgess to Munters the following statement be included:
>
>> "The Munters' Fill product covered by this purchase order will not be used by Burgess Industries for evaporative cooling applications for cooling air, where the cooling of the air is obtained by evaporation of moisture therein, for gas turbines having a minimum related capacity of at least 500 Horsepower and for the equipment connected thereto." ' " Exhibit BF–25.

The instant action was commenced on September 19, 1975. Burgess moved for a preliminary injunction ordering Munters to continue supplying the fill to Burgess during the pendency of the action. By Memorandum and Order dated January 19, 1976, after a brief fact-finding hearing, this Court granted the preliminary injunction,

and Buffalo Forge appealed. On June 2, 1976, the court of appeals, finding that there was no support for the contention that the balance of equities tipped decidedly in favor of Burgess, reversed for vacation of the injunction. *Munters Corp. v. Burgess Industries, Inc.,* 535 F.2d 210 (2d Cir. 1976).

### *Reopening the Record*

■ Following the brief trial, Buffalo Forge moved to reopen the record to permit the submission of an amendment to the 1972 Agreement. This amendment, dated May 4, 1976, removes the words "solely for use" from clause 1 of Article II of the 1972 Agreement (quoted above) and provides that these words are to be "considered as having been deleted and of no significance since the date of execution" of the 1972 Agreement.

The Supreme Court has stated that a motion to reopen the record is addressed to the discretion of the district court. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). In this instance, the Court will permit the amendment to be placed on the record, although its addition does not affect the outcome of the case. Even if the Court were to find that the amendment was retroactive or to accept the contention of Buffalo Forge and Munters that the 1972 Agreement was not meant to restrict the use to which *Buffalo Forge* or *its* customers could put the Munters fill, the legal effect of the agreement with respect to this action would be the same. In the instant case it is not Buffalo Forge which is challenging the restrictions placed on *its* use of the Munters fill, the issue to which the "solely for use" language would be relevant. Rather, it is *Burgess* which contends that *it* is restricted because the exclusive license granted to Buffalo Forge purports to restrict the use to which other purchasers, such as Burgess, may put the fill. It is this aspect of the 1972 Agreement, not affected by the dele-

---

4. Throughout 1974 and 1975, Burgess purchased Munters fill for many industrial applications, with total purchases in those years of $105,000. For the same period, Buffalo Forge's purchases of the fill totalled $213,000. Trial Transcript at 30.

tion of the "solely for use" language, which is at issue here.

### The 1972 Agreement and the Antitrust Laws

The arguments of the parties with respect to the antitrust implications of the 1972 Agreement are basically attempts to characterize that agreement in accordance with dispositive Supreme Court precedent. Thus, Buffalo Forge and Munters argue that the agreement constitutes an exclusive field-of-use *license* proper under the antitrust laws even though it restricts the activities of other users of the Munters fill, since those restrictions fall within the scope of the patent monopoly and are thus valid under the rule of *General Talking Pictures Corp. v. Western Electric Co.,* 304 U.S. 175, 58 S.Ct. 849, 82 L.Ed. 1273, *aff'd on rehearing,* 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81 (1938). Burgess, on the other hand, asserts that the 1972 Agreement is "no more than a vehicle by which Munters *sells* its patented fill to Buffalo Forge under conditions which give Buffalo Forge a competitive advantage over Burgess," Brief After Trial of Defendant Burgess at 3 (emphasis added), and is therefore unprotected against anti-trust attack under the doctrine of *United States v. Univis Lens Co.,* 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). Thus Burgess contends that by selling the fill, Munters surrenders the right to impose restrictions on its use and that such restrictions therefore constitute *per se* violations of the antitrust laws.

■ An examination of the Supreme Court cases and their progeny together with the 1972 Agreement leads this Court to conclude that Burgess's characterization must prevail: the 1972 Agreement is essentially different from the licensing arrangement at issue in *General Talking Pictures* but is almost indistinguishable from the sale discussed in *Univis.* Thus, under *Univis,* the 1972 Agreement, insofar as it seeks to prevent purchasers of the Munters fill other than Buffalo Forge from using the product in the construction of evaporative coolers for certain gas turbine engines, is invalid under the antitrust laws.

In the *Univis* case, the Supreme Court was asked to decide whether certain aspects of an agreement between a patentee and several licensees were protected from anti-trust scrutiny on the ground that they were within the scope of the patent monopoly. The Univis Corporation ("Univis") was the owner of a number of patents relating to the manufacturing of multifocal lenses for eyeglasses. It licensed the Univis Lens Company ("Lens Company") to manufacture lens blanks and sell them to designated licensees of Univis. These latter licensees included three groups: wholesalers, who ground and sold lenses to retailers; finishing retailers, who ground and sold lenses directly to consumers; and prescription retailers, who did not grind lenses themselves but who purchased lenses from the wholesalers ground to certain prescriptions. Each of the licenses to these three groups was conditioned upon the maintenance by the licensee of certain prescribed resale prices. The district court found that the patents in question were for finished lenses and therefore were not completely practiced until the lenses were ground to prescription. *United States v. Univis Lens Co.,* 41 F.Supp. 258, 263 (S.D.N.Y.1941), *aff'd in part, rev'd in part,* 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408 (1942). Thus it held that the resale price restrictions in the licenses to those groups which ground the blanks purchased from the Lens Company into finished lenses themselves—the wholesalers and the finishing retailers—were within the scope of the patent monopoly and thus permissible under the authority of *United States v. General Electric Co.,* 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), and its progeny. *United States v. Univis Lens Co., supra,* 41 F.Supp. at 264–65. At the same time, however, the district court held that the license to the prescription retailer was illegal since the sale of the ground lens to that retailer exhausted the patent monopoly and with it the right of the patentee to impose resale conditions on the patented article. *Id.* at 265.

The Supreme Court accepted the latter holding, but reversed as to the licenses to

the wholesalers and the finishing retailers. The Court found that for all intents and purposes the patented article had been sold at the time the lens blank was sold by the Lens Company to the licensees and that this sale therefore exhausted the patent monopoly. 316 U.S. at 249–50, 62 S.Ct. 1088. The Court stated:

> "The declared purpose of the patent law is to promote the progress of science and the useful arts by granting to the inventor a limited monopoly, the exercise of which will enable him to secure the financial rewards for his invention. Constitution of the United States, Art. I, § 8, Cl. 8; 35 U.S.C. §§ 31, 40. The full extent of the monopoly is the patentee's 'exclusive right to make, use, and vend the invention or discovery.' The patentee may surrender his monopoly in whole by the sale of his patent or in part by the sale of an article embodying the invention. His monopoly remains so long as he retains the ownership of the patented article. But sale of it exhausts the monopoly in that article and *the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article.* . . . Hence the patentee cannot control the resale price of patented articles which he has sold, either by resort to an infringement suit, or, consistently with the Sherman Act (unless the Miller-Tydings Act applies), by stipulating for price maintenance by his vendees. . . ." *Id.* at 250, 62 S.Ct. at 1093 (emphasis added).

Thus, the Court found, "[t]he added stipulation by the patentee fixing resale prices derives no support from the patent and must stand on the same footing under the Sherman Act as like stipulations with respect to unpatented commodities." *Id.* at 251, 62 S.Ct. at 1093.

The circumstances of the instant case make out even a stronger case for exhaustion of patent rights than that presented in *Univis.* Here there is no doubt that the patented article is fully produced and the patent fully practiced when the Munters fill is manufactured by Munters and sold to consumers. Nothing remains to be done by a purchaser such as Burgess or Buffalo Forge except to put the fill to use; the patents licensed to Munters do not relate to any such use. In this case, as in *Univis,* no royalty is exacted by the patentee or the manufacturing licensee; rather, the entire consideration and compensation for the use of the fill is the purchase price paid to Munters. *Cf. id.* at 249–50, 62 S.Ct. 1088.

Furthermore, the fact that the arrangement is denominated a "license" is without significance. In *Univis,* where the agreements were so characterized, the Supreme Court looked to the substance of the arrangement and found that it was essentially a *sale* of a patented article, notwithstanding the fact that certain elements of the patent remained to be practiced by the purchaser after the sale. A fortiori, in the case at bar, where the patent has been fully practiced before the sale, the characterization of the arrangement as a "license" is of even less assistance in extending the protection of the patent monopoly to restrictions governing the use of the article following the sale.

*General Talking Pictures Corp. v. Western Electric Co., supra,* on which Buffalo Forge and Munters largely rely, was decided four years before *Univis* and presents a very different factual situation. In *General Talking Pictures* the Supreme Court was asked to consider whether the sale of a patented article by a licensee in violation of the restrictions of the license constituted infringement of the patent by the licensee. American Telephone & Telegraph Company owned several patents for vacuum tube amplifiers which were capable of being used in the "commercial field," which included talking picture equipment for movie theaters, and the "private field," encompassing private radio reception. 304 U.S. at 176, 179, 58 S.Ct. 849. Exclusive licenses were granted under these patents to several companies manufacturing and supplying amplifiers to the commercial field; non-exclusive licenses were granted to a number of manufacturers for the private field. *Id.* at 179, 58 S.Ct. 849. The American Transformer Company ("Transformer") had a non-exclu-

sive license which was restricted to the right to manufacture and sell the amplifiers in the private field. *Id.* at 179–80, 58 S.Ct. 849. Nevertheless, Transformer sold its amplifiers to the General Talking Pictures Corporation, knowing that they were to be used in the commercial field. *Id.* at 180, 58 S.Ct. 849.

The Court held that this sale infringed the patents because it was outside the scope of the license. The Court also found that the license was within the rights of the patentee to grant since it did not "extend the scope of the monopoly beyond that contemplated by the patent statute." *Id.* at 181, 58 S.Ct. at 852. Upon rehearing, the Court further explained that it had reached only the infringement question and did not consider "what the rights of the parties would have been if the amplifier had been manufactured 'under the patent' and 'had passed into the hands of a purchaser in the ordinary channels of trade.'" 305 U.S. at 127, 59 S.Ct. at 117.

A careful reading of *General Talking Pictures* and the cases following it demonstrates that the arrangements under which Munters transfers rights in the manufactured fill fall not within the scope of *General Talking Pictures* but must be seen as transactions in which products "manufactured 'under the patent'" pass "'into the hands of a purchaser in the ordinary channels of trade'"—the situation which the Court explicitly stated was not reached by *General Talking Pictures* but which was definitively covered in the *Univis* decision some four years later.

In *General Talking Pictures* the licensee was given the right to manufacture and sell the patented article. Under these conditions, the Court held, the patentee could impose conditions on the sale of the patented article by the manufacturing licensee and those conditions would be within the scope of the patent monopoly. In the instant case, however, the situation is completely different since Munters does not license the manufacture of the patented article but practices the patent itself and then transfers the completed item to a "li-

censee" or purchaser. Under these circumstances, the rights of the parties are quite different from the rights as they existed in *General Talking Pictures.*

As the Court pointed out in the latter case, a license is "no more than 'a mere waiver of the right to sue.'" 304 U.S. at 181, 58 S.Ct. at 852, *quoting De Forest Co. v. United States,* 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927). Thus, only where a patentee would otherwise have the right to sue a licensee for infringement of the patent in the absence of the agreement described as a "license" does that agreement come within the protection afforded by the rule of *General Talking Pictures.* In *Univis,* however, the Court examined an arrangement much like the one at bar and decided that the patentee, having transferred a manufactured patented article, even to one described as a "licensee," could not sue for infringement of the license if the purchaser resold the article outside the restrictive conditions of the "license":

> "[S]ale of [the patented article] exhausts the monopoly in that article and the patentee may not thereafter, by virtue of his patent, control the use or disposition of the article. . . . Hence the patentee cannot control the resale price of patented articles which he has sold . . . by resort to an infringement suit". 316 U.S. at 250, 62 S.Ct. at 1093.

Thus, when a patented product has been sold, attempts to control its use are beyond the reach of legal action by the patentee and therefore beyond the scope of the monopoly as discussed in *General Talking Pictures.*

Moreover, *General Talking Pictures* concerned a situation in which the patentee, having surrendered his statutory right to manufacture pursuant to his patent and placed someone else in that position, could grant that license, as the Court stated, "'upon any condition the performance of which is reasonably within the reward which the patentee by the grant of the patent is entitled to secure.'" 305 U.S. at 127, 59 S.Ct. at 117, *quoting United States v. General Electric Co., supra,* 272 U.S. at

489, 47 S.Ct. 192. Since the patentee, standing alone, has the manufacturer's normal right to select his purchasers or to confine the sales of his patented article to certain areas, *see United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919), as well as the patentee's " 'exclusive right to make, use, and vend the invention or discovery' ", *United States v. Univis Lens Co., supra,* 316 U.S. at 250, 62 S.Ct. at 1093, the patentee may condition a license for the manufacture and sale of a patented article upon similar restrictions. It is important to note that under a license to manufacture and sell, the patented article has not passed into the stream of commerce until it is sold by the licensee. Up to that point—when the patent has been fully practiced and the patented article is completed—the patent grants the patentee the power to place restrictions on the use or sale of the patented article. But once the patented article is sold, the patentee loses all power to control its future use or sale.[5]

Several later cases further demonstrate the essential differences between *General Talking Pictures* and *Univis.* In two cases, the courts specifically and explicitly distinguished between the antitrust implications of a license to manufacture and sell—finding restrictions in such a license valid—and those of a sale or of a license to use—where restrictions were found invalid. In *Hensley Equipment Co. v. Esco Corp.,* 383 F.2d 252 (5th Cir. 1967), the Esco Corporation ("Esco") held a patent on a type of machine part used in excavating machines. It licensed Caterpillar to manufacture, use and sell articles embodying the patent but restricted the use or sale of such articles to products or equipment manufactured by or for Caterpillar. Caterpillar never actually manufactured the parts, however, choosing instead to purchase the patented articles from Esco or its subsidiaries and licensees.

The court found that the restriction, insofar as it was not limited to items manufactured by Caterpillar, the licensee, was not protected by the patent and was in fact a *per se* violation of the antitrust laws. *Id.* at 262–64, *citing United States v. Univis Lens Co., supra, and United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). The court stated: "Patent monopoly is 'exhausted' by the first authorized sale of the patented item, and the patent law does not protect attempts by the patentee or his licensees to control use of the product after such sale." *Id.* at 263.

In a more recent unreported decision, *United States v. Ciba-Geigy Corp.,* Civil Action No. 791–69 (D.N.J. April 15, 1976) (Meanor, J.), the court made a similar distinction. The defendant, a leading pharmaceutical company, held the patent on a drug which is also manufactured. It entered into a series of supply agreements with other drug companies in which the drug was sold on the condition that it be resold only in a certain form. It also entered into licenses with several other drug companies in which the licensees were permitted to manufacture and sell the drug on the same condition. The court found that the supply agreements were vertical restraints designed to limit horizontal competition and therefore constituted *per se* violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Slip opinion at 55–56. The licenses to manufacture and sell, on the other hand, received completely different treatment: the court sustained the identical restrictions contained therein as within the legitimate scope of the patent monopoly. *Id.* at 60–61, *citing General Talking Pictures Corp. v. Western Electric Co., supra.*

The distinction is further borne out by the analysis in *United States v. General*

---

5. Because this Court concludes that this case comes within the orbit of *Univis* rather than of *General Talking Pictures* and that the agreement between Munters and Buffalo Forge as well as those between Munters and other purchasers of the fill should not be considered as the type of licenses under consideration in *Gen-eral Talking Pictures,* it is not necessary to consider the many cogent arguments for reconsideration of the rule of *General Talking Pictures* raised by the commentators. *See, e. g.,* Adelman & Juenger, Patent-Antitrust; Patent Dynamics and Field-of-Use Licensing, 50 N.Y. U.L.Rev. 273 (1975).

*Electric Co., supra,* 272 U.S. at 489–90, 47 S.Ct. at 196–197,[6] where the Court stated:

"It is well settled, as already said, that *where a patentee makes the patented article and sells it,* he can exercise no future control over what the purchaser may wish to do with the article after his purchase. It has passed beyond the scope of the patentee's rights. . . . But the question is a different one which arises when we consider what a patentee who grants a license to one *to make and vend* the patented article may do in limiting the licensee in the exercise of the right to sell." (Emphasis added).

Moreover, in *Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co.,* 169 F.Supp. 1 (E.D.Pa.1958), the court found *Univis* directly applicable to a licensing scheme which contained use restrictions. The exclusive licensee of a patent had the right to sublicense a patent. It chose, however, to exploit the patent by manufacturing the patented product and selling it under a "license" which prohibited the vendees from using the product in certain ways. The court found that *Univis* was applicable since the article had been sold by the manufacturer and therefore the vendor could no longer control the use of the article. Thus, the court held, the attempt to allocate or divide marketing territories was a *per se* violation of the Sherman Act. *Id.* at 28–30.

Finally, in *United States v. Consolidated Car-Heating Co.,* 1951 Trade Cas. ¶ 62,656 (S.D.N.Y.1950), the court found that use restrictions contained in a license for the use of an alloy which was purchased from the patentee were invalid. As in the case at bar, the agreement was termed a "license" and the licensee was required to purchase certain minimum quantities of the alloy. The court stated:

"[A patentee] may not grant a license to use his patented product, which can be purchased only from him, in manufacturing another product, whether patented or not, and provide that it shall be used only to manufacture that product. This is because the patented product, when it has been sold, passes outside the limits of the patent monopoly and the patentee cannot attach any further conditions to its use by the purchaser." *Id.* at 63,903.

In the case at bar, a restriction is placed on the use of the fill after its purchase from Munters: purchasers other than Buffalo Forge may not use it in the production of evaporative cooling devices for certain gas turbines. On the authority of *Univis* and cases which have followed it, such a restriction cannot stand.

The cases cited by Buffalo Forge as supporting restrictive conditions in licenses actually demonstrate that the rule of *General Talking Pictures* is not applicable to the instant case. In many of the cases cited, as in *General Talking Pictures* itself, the licensee was licensed to manufacture the patented article under the patent, and conditions were imposed on the sale (as opposed to the resale) by the licensee.[7] All but one of the

---

6. The continuing vitality of the *General Electric* case has been called into question by the commentators, *see, e. g.,* Adelman & Juenger, *supra* note 75, at 285–88; Gibbons, Field Restrictions in Patent Transactions: Economic Discrimination and Restraint of Competition, 66 Colum.L. Rev. 423, 456–57 (1966), and the Supreme Court has come close to overruling it on several occasions. *United States v. Huck Mfg. Co.,* 382 U.S. 197, 86 S.Ct. 385, 15 L.Ed.2d 268 (1965), *aff'g by an equally divided Court* 227 F.Supp. 791 (E.D.Mich.1964); *United States v. Line Material Co.,* 333 U.S. 287, 68 S.Ct. 550, 92 L.Ed. 701 (1948). But the criticism of the case is aimed at its rule which permits patentees to fix the prices at which patented articles may be sold by *manufacturing* licensees. Thus, insofar as it stands for the proposition that such conditions may *not* be imposed on those who do not manufacture, *General Electric* may be assumed to be good law.

7. *Armstrong v. Motorola, Inc.,* 374 F.2d 764 (7th Cir. 1967) (license to manufacture patented FM systems); *Hazelton Research, Inc. v. Admiral Corp.,* 183 F.2d 953 (7th Cir.), *cert. denied,* 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650 (1950) (license to manufacture television receivers incorporating a patented feature); *Automatic Radio Mfg. Co. v. Hazelton Research, Inc.,* 176 F.2d 799 (1st Cir. 1949), *aff'd,* 339 U.S. 827, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (license to manufacture radios incorporating any of licensor's patents); *Benger Laboratories, Ltd. v. R. K. Laros Co.,* 209 F.Supp. 639 (E.D.Pa.1962), *aff'd,* 317 F.2d 455 (3d Cir.), *cert. denied,* 375

remaining cases cited by Buffalo Forge concern licenses to use a patented machine or process in the production or testing of some other machine.[8] In the case at bar, however, the Munters fill is not itself used to produce some other item but is merely one component part from which a different machine is assembled. The fill is not leased to its purchasers; they pay no royalty for each use of the fill. Rather, the patented fill is a commodity which is produced by Munters and sold in various quantities to purchasers who make use of it in a wide variety of ways. Any attempt to continue to exercise control over its use or resale after the initial sale by Munters is, as *Univis* teaches, a restraint outside the scope of the patent monopoly protection.

Once the arrangement by which Buffalo Forge is granted the exclusive right to use the Munters fill in the "Product Use Area" and by which other purchasers of the fill are prohibited from such use loses its patent protection, it must be found invalid under the antitrust laws. *See Hensley Equipment Co. v. Esco Corp., supra; United States v.*

*Ciba-Geigy Corp., supra; Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., supra; United States v. Consolidated Car-Heating Co., supra.* In *United States v. Arnold, Schwinn & Co., supra,* the Supreme Court held that a manufacturer's sale to a distributor, subject to a territorial restriction upon resale, was a *per se* violation of the Sherman Act. 388 U.S. at 379, 87 S.Ct. 1856, 1865. The Court stated: "If the manufacturer parts with dominion over his product or transfers risk of loss to another, he may not reserve control over its destiny or the conditions of its resale." *Id.*[9]

Although the restrictions upon the use of the Munters fill were imposed vertically upon Burgess, their origin in the 1972 Agreement makes it clear that they were intended to restrain horizontal competition between Buffalo Forge and all other purchasers. Indeed, no one has disputed this basic fact: the 1972 Agreement was designed to protect Buffalo Forge from competition in the "Product Use Area." Instead, Buffalo Forge and Munters have at-

U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963) (license to manufacture a patented drug); *United States v. Birdsboro Steel Foundry & Mach. Co.,* 139 F.Supp. 244 (W.D.Pa.1956) (license to make equipment used in the production of steel); *Lanova Corp. v. Atlas Imperial Diesel Engine Co.,* 75 U.S.P.Q. (BNA) 225 (Del.Super. Ct.1947) (license to manufacture patented engines).

8. *Turner Glass Corp. v. Hartford-Empire Co.,* 173 F.2d 49 (7th Cir. 1949) (license to use leased patented machine to produce glassware); *Extractol Process v. Hiram Walker & Sons,* 153 F.2d 264 (7th Cir. 1946) (license to use patented machine, upon payment of royalty, to extract oil from distillers' grains); *Barr Rubber Prods. Co. v. Sun Rubber Co.,* 277 F.Supp. 484 (S.D.N.Y.1967) (license to use patented process to produce hobby horses); *Sperry Prods., Inc. v. Aluminum Co. of America,* 171 F.Supp. 901 (N.D.Ohio 1959) (license to use patented device for detection of flaws in metal parts).

The final case, *Deering, Milliken & Co. v. Temp-Resisto Corp.,* 160 F.Supp. 463 (S.D.N.Y. 1958), is more difficult to classify but probably falls within the first group of cases. In *Deering, Milliken & Co.* the plaintiff/patentee had a patent on a process by which plain fabric was bonded together with heat reflective fabric as well as a patent on fabric thus bound together. It licensed one company to do the bonding and

another group ("converters") which collected the necessary fabric and sent it to the mill for bonding. Title to the fabric remained in the converters, who then sold it on conditions restricted by the patentee. Here, as in the manufacturing cases, the patented fabric was not produced until the mill bonded it. Once manufactured, it received its first sale by the converters. Thus, that sale could be controlled by the patentee.

9. Although the Court stated in a footnote that it was not considering "whether a patentee has any greater rights in this respect", *id.* n. 6, it would seem to this Court that the earlier decision in *Univis* provides a conceptual framework which requires the application of the principles of *United States v. Arnold, Schwinn & Co.* to this case. Moreover, by citing directly to the *General Electric* case and to the cases which came close to overruling it, the Court in this footnote indicated that its primary concern was to avoid any implication that *Schwinn* had an effect on the continuing validity of *General Electric* rather than to state any positive principle regarding patents. Furthermore, *General Electric* specifically distinguished between its facts and the type of transaction involved in the instant case, *see* note 5 *supra,* while *Univis* subsequently stated the law governing the latter situation.

tempted to demonstrate that the agreement fostered rather than forestalled competition by permitting the development of a new product line employing the Munters fill. These parties contend that Buffalo Forge would never have undertaken the expense, stipulated as $128,423.55, Stipulations of Fact ¶ 34, to develop and market products employing the fill in the "Product Use Area." [10] As was discussed above, there is some doubt concerning this latter point. Regardless of the compelling realities of investment incentives in research and development, the agreement falls within the proscriptions of the antitrust laws. There can be no doubt that it was anti-competitive in the sense that it purported to give to Buffalo Forge complete dominance in the sale of products in the "Product Use Area" and insulated Buffalo Forge from any of the effects of competition, deemed desirable by the antitrust laws, for a period of up to ten years. In this way Buffalo Forge avoided what one of its employees described as "the dangers of working in the business world." Trial Transcript at 86.

Thus, the intention of the 1972 Agreement was to put Buffalo Forge in the position of one who had obtained patents on the evaporative coolers within the "Product Use Area" when in fact it had obtained no such patents. This attempt to extend the monopoly granted for the patents concerning the Munters fill into other areas is precisely the kind of overreaching that the cases condemn.

### Amendment of Defendant Burgess's Answer

On the eve of trial defendant Burgess moved for leave to amend its answer in order to assert an antitrust counterclaim against Munters and a similar cross-claim against Buffalo Forge. Rule 13(f) of the Federal Rules of Civil Procedure ("Rules") permits an omitted counterclaim to be set up by amendment "when justice requires";

the decision to allow amendments to pleadings is left to the sound discretion of the Court. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In this instance, the Court concludes that the amendment should be permitted. Although it was requested on the eve of trial, the amendment in no way affected the trial itself, which was concerned only with whether the 1972 Agreement should be declared to be in violation of the antitrust laws. Thus, Buffalo Forge and Munters may not complain of prejudice or surprise at trial.

At the same time, the interest of justice requires that the counterclaim and cross-claim be made a part of this action since they involve transactions and occurrences with which the Court has already become familiar. Indeed, it would appear that the counterclaim sought to be asserted is "compulsory" under Rule 13(a). Furthermore, the Court disagrees with the contention that Burgess is barred from asserting the counterclaim and cross-claim by reason of delay. This action moved along quite quickly. The complaint was filed in September 1975; Burgess filed its answer in November. A hearing on the preliminary injunction was held in December and decision was reached in January 1976. The trial was held in March 1976, only four months after Burgess answered. Thus, any delay here is much less than in *Spartan Grain & Mill Co. v. Ayers,* 517 F.2d 214 (5th Cir. 1975), where the court of appeals found that the district court should have allowed the addition of a counterclaim notwithstanding the fact that the request for an amendment followed the answer by 16 months. *Id.* at 220. The court in that case held that the rules concerning amendments should be interpreted liberally, particularly with respect to compulsory counterclaims. *Id.*

---

10. These expenses were broken down by the parties according to the following categories:

| | |
|---|---|
| Projects | $23,579.07 |
| Travel | 5,747.79 |
| Salaries | 73,250.00 |
| Advertising | 25,887.69 |

(These figures total $128,464.55, $41.00 more than the total provided by the parties). Stipulation of Facts for Trial ¶ 34.

Accordingly, leave is granted to Burgess to file its amended answer and counterclaim.

### Summary

In sum, the Court declares that the 1972 Agreement between Buffalo Forge and Munters constitutes a *per se* violation of the Sherman Act insofar as it attempts to restrict the use of the fill by other purchasers of the Munters fill, such as Burgess. Burgess is given leave to file its amended answer, counterclaim and cross-claim.

So ordered.

### ON REARGUMENT

By Opinion dated May 27, 1977, this Court found that restrictions upon the use of Munters fill established by agreement between Munters and Buffalo Forge were invalid under the Sherman Act. In reaching this conclusion, the Court relied in large measure upon the *per se* rule of *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967). That rule was overturned, however, in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), decided by the Supreme Court after this Court had issued its decision. Accordingly, counsel for all parties were asked to brief the antitrust implications of *Continental T.V.* for the instant case. At approximately the same time, counsel for Buffalo Forge made an application for a certificate pursuant to Rule 54(b), or, in the alternative, for certification pursuant to 28 U.S.C. § 1292(b). For the reasons stated below, the Court reaffirms its earlier finding of an antitrust violation and declines to issue the certificates requested under Rule 54(b) and section 1292(b).

### Antitrust Violations

In its earlier opinion, the Court concluded that Munters's "attempt to continue to exercise control over [the fill's] use or resale after the initial sale by Munters [was] . . a restraint outside the scope of the patent monopoly protection" afforded to Munters on the fill. Opinion at 1205. That conclusion is fully affirmed on rehearing, notwithstanding counsel's efforts to reargue the point. However, the Court also concluded previously that the vertical field-of-use restriction, stripped of the protection of the patent, constituted a *per se* violation of the antitrust laws under the holding of *United States v. Arnold Schwinn & Co., supra.* Now, in *Continental T.V.*, the Supreme Court has stated that it is more appropriate "to return to the rule of reason that governed vertical restrictions prior to *Schwinn.*" 433 U.S. at 59, 97 S.Ct. at 2562. Thus, the trade restriction under challenge in this case must be reexamined under the "rule of reason."

Justice Brandeis's statement of that rule in *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918), was cited with approval in *Continental T.V.*, 433 U.S. at 49–50 n.15, 97 S.Ct. 2549:

"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences."

Notwithstanding this Court's primary reliance on the *Schwinn per se* rule in the earlier decision, it was indicated therein that other aspects of the restriction and its creation supported the conclusion that the

field-of-use restriction imposed on all purchasers of the Munters fill other than Buffalo Forge was anticompetitive. Thus, in the earlier opinion the Court observed that the impetus for the restriction came not from the manufacturer (Munters) seeking to induce a purchaser to open up new markets, *see Continental T.V., supra,* 433 U.S. at 55, 97 S.Ct. 2549, but from the purchaser itself seeking to insulate itself from "the dangers of working in the business world." Opinion of May 27, 1977, at 1197, 1206. Moreover, the Court found that it was far from certain that the restriction was necessary in order to induce Buffalo Forge to undertake the expense, largely promotional, of opening up the market for evaporative coolers for gas turbines using the Munters fill. *Id.* at 1197. The Court has now reviewed the record, including the testimony at trial, the exhibits and depositions introduced into evidence, in the light of the *Continental T.V.* decision, and concludes that even under the rule of reason the restriction imposed by agreement between Munters and Buffalo Forge violated the antitrust laws. Accordingly, the Court's earlier finding of an antitrust violation is reaffirmed.

The history of the relation between Munters and Buffalo Forge is set out in the earlier opinion and need not be repeated in full. Suffice it to say that Munters was seeking purchasers for its fill and that Buffalo Forge's attention was called to the product at an industrial exposition. The fill is a material which may be used as a component part of a great variety of products; it is purchased by companies which use it in the construction of such diverse machines as cooling towers and waste water treatment filters. Stipulation of Facts ¶ 4. It is Munter's standard practice to sell the fill with "an implied use license"; the Munters price lists contain the following notice:

> *Patent Notice :* Each of these products is manufactured under one or more patents issued in the U.S.A. and foreign countries. Purchases of these products carries a free patent license to sell and use same in all areas of the world except Scandinavia.

In this instance, however, Buffalo Forge approached Munters with a request that it be granted an exclusive "license" for "the whole field of evaporative cooling for industrial use." Trial Transcript at 33 (Nordling testimony). Robert Jorgenson, a chief engineer at Buffalo Forge, testified that the desire for an exclusive license grew out of the company's previous experience in having one of its designs, unprotected by patent, copied by a competitor and sold at a lower price. *Id.* at 84–86.

Munters objected to the broad scope of the "license" on the ground that "there [were] numerous companies in the United States that would make better sales in other type[s] of applications." *Id.* at 33 (Nordling). Munters eventually agreed, however, to limit the field to the "Product Use Area" discussed in the earlier opinion and to accede to Buffalo Forge's demand for ten years' protection since Munters "had the feeling that [Buffalo Forge] would not go into the agreement . . . without having such protection." *Id.* at 34. Since entering into the agreement with Buffalo Forge, however, Munters has refused to enter into similar exclusive agreements. *Id.* at 37.

Munters states that it agreed to the narrowly drawn exclusive arrangement because it wished to open up a new product area in which it had no previous experience or technological knowledge without burdening itself financially. Stipulations of Fact ¶ 26. The force of this argument is weakened substantially by much of the evidence, however. Nordling, Munters's president and general manager, testified that Munters had experience with as many as 10,000 evaporative cooling installations in Europe before the agreement with Buffalo. Trial Transcript at 26. Furthermore, Munters was able to provide Buffalo Forge (and ultimately Burgess) with a great deal of technical information about the fill, Stipulation of Facts ¶ 33, allowing Buffalo Forge to focus its testing primarily on the special problems of evaporative cooling for gas turbines. Trial Transcript at 90–95. Indeed, the actual technological problems involved

seemed to be few. Yaeger, the general manager of the Burgess division which manufactures evaporative coolers, testified at his deposition that cooling mechanisms using the fill are "identical, regardless of what you use it for, whether it's turbine or ventilation purposes or for a cooling tower." Deposition of Ronald J. Yaeger, taken December 8–9, 1975, at 113 ("Yaeger Deposition"). An employee of Buffalo Forge also testified at trial that the data initially given to Buffalo Forge by Munters involved a cooler which functioned on the same principles as the model used by Buffalo Forge to demonstrate the use of the fill in evaporative cooling to companies which Buffalo Forge was trying to persuade to buy its gas turbine coolers. Trial Transcript at 137 (Pokorski testimony). It is evident that most of the technical work consisted simply of testing to determine if the available technology would work when used in connection with gas turbines. Stipulations of Fact ¶¶ 34–35; Trial Transcript at 90–95. Moreover, the relative insignificance of the technological problems involved is revealed by the fact that the greater portion of the money spent by Buffalo Forge in developing and selling the coolers was spent not on developing technology but on seminars in which Buffalo Forge employees attempted to convince the "unusually conservative" gas turbine engineers to try the new product. *Id.* at 129.

Munters's argument that its lack of experience in gas turbine cooling foreclosed development of that area is further called into question by the fact that Munters was not itself in the business of exploiting the various uses of its fill by actually manufacturing completed machines using the fill. As Nordling testified,

> You have to understand that we are not selling a complete cooler for the gas turbine industry. We are not selling any compete unit that goes to the ultimate user in any case. We are selling a material that goes in as a component for somebody that has to develop a complete unit.

Trial Transcript at 55. Thus, Munters exploited the various possible fields by finding other companies. The question thus arises:

Was it necessary—or reasonable—for Munters to grant this exclusive right to Buffalo Forge in order to induce that company to exploit the gas turbine market? The Court concludes that it was not.

As discussed above, the initiative for the restriction came from Buffalo Forge (the purchaser) rather than from Munters (the manufacturer/seller). Thus, this restriction is quite different from that in either *Continental T.V.* or *Schwinn*, where "[b]oth *Schwinn and Sylvania [the manufacturers/sellers] sought* to reduce but not to eliminate competition among their respective retailers through the adoption of a franchise system." *Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 46, 97 S.Ct. at 2556 (emphasis added). Moreover, an officer of Buffalo Forge testified at trial that "[i]t was kind of debatable" whether Buffalo Forge would have undertaken the development of the gas turbine cooler without the exclusivity and that "I think we would not have done it or at least not so soon." Trial Transcript at 103. Furthermore, in his final report on the test results of the Munters fill, Buffalo Forge's engineer stated:

> In case we develop an evaporative cooler utilizing Munters fill and are not able to prevent anybody else doing the same, the "Humi-Kool" may adversely effect [sic] the sales of Buffalo's other wet units . . . . However, it can be argued, that if we do not go ahead, somebody else will start using this fill.

BF Exh. 46, at 4. Thus, Buffalo Forge demanded a broad exclusive license from Munters and received a somewhat narrower one, notwithstanding the possibility that another firm in the field might have undertaken the exploitation of the gas turbine field without the exclusivity. Moreover, Munters's president did not state that Munters had made a thorough exploration of the possible ways of exploiting the field. Rather, he testified that "Buffalo Forge told us at the time that for the cooling of the gas turbine they were the dominating part of the market and we felt satisfied with that statement." Trial Transcript at 33.

Burgess is Buffalo Forge's principal competitor in the sale of evaporative coolers for gas turbines. Stipulation of Facts ¶ 13. There is no evidence that Munters made any attempt to find out whether Burgess would be willing to develop the gas turbine field using the Munters fill without exclusive rights to that field, although there was some routine correspondence between Munters and a Burgess subsidiary in 1971. Yaeger Deposition at 24–27. Apparently Burgess was not in active pursuit of new developments such as the use of the fill for cooling because the company was in the process of reorganization and setting up new research facilities. *Id.* at 25–33. It is far from clear, however, that Munters could not have found one or more companies willing to exploit this field without the exclusive arrangement demanded by Buffalo Forge.

The gas turbine cooler market is limited both as to purchasers and sellers. In addition to Burgess and Buffalo Forge, the only other major competing seller is American Air Filter Company. Stipulation of Facts ¶ 13. On the purchasing side, there are "only three fully integrated large industrial gas turbine manufacturers in the United States . . . [:] Westinghouse, General Electric and Turbodyne." Yaeger Deposition at 115. Other companies also produce turbines on a limited scale. *Id.* at 116; Stipulation of Facts ¶ 15. The importance of the "big three" is demonstrated by the fact that all but one of the seminars conducted by Buffalo Forge in 1972–74 for the purpose of convincing the purchasers to use coolers employing the Munters fill were directed at GE, Westinghouse and Turbodyne. *Id.* ¶ 32. In 1973, Burgess first became aware of the impact on the market of Buffalo Forge's new coolers using the fill. Buffalo Forge had sold a cooler using the fill to GE for a gas turbine installation in Arizona, and an employee of Burgess concluded that other such coolers would be sold "[i]f this cooler passes General Electric's test." *Id.* ¶ 49 (Memorandum of Ugo A. Bert). He also noted that another company, Farr Co., was offering the Buffalo cooler for use by Westinghouse and concluded

that "[i]f the Arizona test is successful, it is my feeling that it is only a matter of time before Westinghouse, Philadelphia, standardizes on this type of inlet cooler." *Id.* According to an employee of Burgess, these predictions came true. Yaeger testified at his deposition that Westinghouse began to specify Munters fill specifically by name for use in gas turbine coolers in 1974, Yaeger Deposition at 121–22, and that General Electric began to do the same in late 1974 or early 1975. *Id.* at 122. Another Burgess employee testified at his deposition that Burgess could not have obtained an order from General Electric had it offered a cooler employing a cooling medium other than Munters fill, Deposition of Lee Capps, taken December 9, 1975, at 18, and that this situation was produced by the cost advantages inherent in using the Munters fill as opposed to the traditional media. *Id.* at 17–18. This cost advantage is the result of the fact that water is distributed over the face of the fill by simple gravitation rather than the more costly water-spraying technique used with other kinds of fill. Yaeger Deposition at 170. This technique also cuts down on ultimate maintenance costs to the owner of the turbine. *Id.* at 173. Finally, Yaeger testified that he did not know of any material other than the Munters fill which provided these benefits and could be substituted for the fill in the production of gas turbine coolers. *Id.* at 190–91.

Thus, it would appear that by appropriating to itself the use of the Munters fill in the production of evaporative coolers for gas turbines Buffalo Forge managed to achieve a significant if not conclusive advantage over its principal competitor in the field. Certainly intrabrand competition in such coolers using Munters fill was eliminated completely: only Buffalo Forge had the right to market this "brand" of cooler. But interbrand competition in the entire area of gas turbine coolers was also significantly affected, if not eliminated. *See Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 51–56, 97 S.Ct. 2549. The Court is not persuaded that this substantial curtailment of competition, even if it was lim-

ited to the relatively narrow field of evaporative coolers for gas turbines of at least 500 horsepower, can be upheld under the rule of reason. Rather, the Court concludes that the exclusivity agreement was not so much a device by which Munters was enabled to enter an otherwise foreclosed market but a means by which Buffalo Forge was allowed to gain a significant advantage over a competitor and to otherwise avoid the "dangers of working in the business world," *i. e.*, the risks attendant upon participation in any competitive market. As was discussed in the Court's earlier opinion, Buffalo Forge believed that it was able to achieve such protection by an extension of the statutory monopoly granted to Munters on the fill, but, as the Court there found, the protection of the patent cannot be stretched so far as to continue the monopoly after the sale of the product nor will the patent on a component element protect essentially unpatentable machines employing the patented element. The Court now concludes that what is beyond the protection of the patent laws in this case is also forbidden by the antitrust laws. Accordingly, the Court declares that the agreement between Buffalo Forge and Munters by which other purchasers of the Munters fill were prohibited from using that fill in the Product-Use Area set forth in the agreement was a violation of the antitrust laws.

*Certification for Appeal*

The Court declines to enter a Rule 54(b) certificate in this case. *See Campbell v. Westmoreland Farm, Inc.*, 403 F.2d 939 (2d Cir. 1968). Similarly, the Court is not of the opinion that the current status of this case is such that "an immediate appeal from [this] order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The Court has disposed of the questions of liability. All that remains is the determination of any damages on Burgess's counterclaim and cross-claim. Immediate resort to the court of appeals will not advance or clarify adjudication of the damage question; the case may be speedily concluded at this time, thus making a single appeal of the entire case possible.

The motion for certification under Rule 54(b) or section 1292(b) is denied.

So ordered.